844 F.2d 1007
 The WEST INDIAN COMPANY, LTD.
v.
GOVERNMENT OF THE VIRGIN ISLANDS,
Legislature of the Virgin Islands, Helen Gjessing, Leonard
Reed, Kate Stull, Lucien Moolenaar and Ruth
Moolenaar, Intervenors.
Appeal of LEGISLATURE OF THE VIRGIN ISLANDS, intervenor
above named, in No. 87- 3369.
Appeal of Helen W. GJESSING, Individually and as President
of the Save Long Bay Coalition, Inc., in No. 87-3370.
Appeal of Kate STULL, Individually and as President of the
League of Women Voters, Inc., and Ruth Moolenaar,
Individually and as Director of the St.
Thomas Historic Trust, Inc.,
in No. 87-3371.
Appeal of Leonard REED, Individually and as President of the
Virgin Islands Conservation Society, Inc., and Lucien
Moolenaar, Individually and as President of the Virgin
Islands 2000, Inc., in No. 87-3372.
 Nos. 87-3369 to 87-3372.
 United States Court of Appeals, Third Circuit.
 Argued Dec. 7, 1987.
Decided March 31, 1988.
 
 Rosalie Simmonds-Ballentine Sol. Gen., Richard O. Baker (argued), Asst. Atty. Gen., Gen. Litigation Services, Dept. of Justice, St. Thomas, V.I., for Government of the Virgin Islands.
 Rhys S. Hodge (argued), St. Thomas, V.I., for Legislature of the Virgin Islands.
 Brenda J. Hollar (argued), St. Thomas, V.I., for Helen W. Gjessing, Individually and as President of the Save Long Bay Coalition, Inc.
 Edith L. Bornn, David A. Bornn (argued), Veronica J. Handy, Law Offices of Edith L. Bornn, St. Thomas, V.I., for Kate Stull, Individually and as President of the League of Women Voters, Inc., and Ruth Moolenaar, Individually and as Director of the St. Thomas Historic Trust, Inc.
 Judith L. Bourne (argued), St. Thomas, V.I., for Leonard Reed, Individually and as President of the Virgin Islands Conservation Soc., Inc., and Lucien Moolenaar, Individually and as President of the Virgin Islands 2000, Inc.
 Before GIBBONS, Chief Judge, and STAPLETON, and MANSMANN, Circuit Judges.OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 The intervenors in this action, including the present Virgin Islands legislature and the officers of various interested citizen groups, appeal from a summary judgment in favor of, and grant of a permanent injunction to, the West Indian Co., Ltd. (WICO). The central issue presented is whether a 1982 agreement between WICO and the Government of the Virgin Islands, ratified by the legislature then sitting, should be considered contractually binding on the present legislature. The district court held that it should; the intervenors contend that it should not. Because we agree with the district court's conclusions that the 1982 agreement is a contract and that the present legislature's attempt to cancel it by means of the Repeal Act is a violation of the contract clause of the United States Constitution, incorporated into Virgin Islands law by Sec. 3 of the Revised Organic Act, we will affirm.
 
 I.
 
 2
 WICO is a Danish-owned Virgin Islands corporation. In 1913, Denmark, then the sovereign of the Virgin Islands, granted WICO, then a Dutch entity, rights in certain parts of the Long Bay area of the St. Thomas harbor on Charlotte Amalie. This grant was evidenced by two letters to WICO from the Danish Ministry of Finance, dated January 18, 1913 and April 16, 1913.[1] Of these letters, the first was the more significant; it provided that when designated submerged areas of the harbor had been reclaimed by WICO, the company would acquire free and unrestricted ownership of the land. No time limitations restricted WICO's reclamation rights under this original grant.
 
 
 3
 In 1914, WICO built a dock and harbor basin in the area covered by the grant, leaving it with reclamation rights in 42 additional acres. Although it did business in the Virgin Islands continuously over the years, using its dock and harbor basin, WICO did not proceed with any further reclamation until 1986.
 
 
 4
 In 1917, Denmark ceded the Virgin Islands to the United States. WICO's rights were specifically preserved by Sec. 3 of the Convention of Cession, which read:
 
 
 5
 4) The United States will maintain the following grants, concessions and licenses, given by the Danish Government, in accordance with the terms on which they are given:
 
 
 6
 a. The concession granted to 'Det vestindiske Kompagni' (the West-Indian Company) Ltd. by the communications from the Ministry of Finance of January 18th 1913 and of April 16th 1913 relative to a license to embank, drain, deepen and utilize certain areas in St. Thomas Harbor, and preferential rights as to commercial, industrial or shipping establishments in the said Harbor.
 
 
 7
 App. at 30, 32. Before signing the Convention, the United States asked Denmark whether the grant to WICO was in perpetuity; Denmark responded that it was, and that there was no limitation as to the time within which WICO had to exercise its rights.[2]
 
 
 8
 No further developments of significance took place until 1968, when the United States Department of the Interior filed suit in federal district court in the Virgin Islands, seeking to quiet title to the area of WICO's Danish grant and secure a declaratory judgment that WICO's treaty rights had lapsed. WICO defended this action, arguing that its treaty rights to reclaim and take title were vested and in perpetuity. While this suit was pending, the Danish Government sent a formal diplomatic note, dated June 25, 1970, to the United States Government, stating that WICO's treaty rights had originally been granted by Denmark without condition as to time and requesting that those rights be respected.
 
 
 9
 WICO proposed a settlement of the suit to both the Department of the Interior and the Virgin Islands Government, although the latter was not formally a party, and negotiations began. The parties to the negotiations included the United States Government, the Virgin Islands Government, WICO, and other private parties with interests in the harbor. The negotiations were successfully concluded in 1972 with a settlement agreement, the substance of which was that WICO would surrender reclamation rights to 12 out of the 42 acres at issue and the United States and Virgin Islands Governments would recognize WICO's right to reclaim and obtain title to the remaining 30 acres. A number of other obligations were also assumed by WICO as conditions of the settlement; for example, WICO agreed to fill in an extra 2.5 acres for public parkland and transfer it to the Virgin Islands Government, and to fill certain waterfront land so as to enable the Government to widen the shoreline highway from two to four lanes. The conditions of the settlement agreement were embodied in a document called the Memorandum of Understanding. The parties included in the Memorandum a statement of reasons why they believed the conveyance to WICO would further the public interest, including not only the above benefits but also the expected increase in employment, improvement of facilities for tourism, and elimination of the "possible cloud over the future of St. Thomas Harbor" posed by WICO's Danish rights.
 
 
 10
 Because at that time the United States held title to the submerged lands surrounding the Virgin Islands, the parties to the settlement considered it necessary to arrange a two-step procedure for transferring title to the 30 acres to WICO after reclamation: the United States Government would convey to the Virgin Islands Government, and the Virgin Islands Government to WICO. The Memorandum was not particularly clear, however, on just when the transfer of title was to be accomplished. It provided that after specified conditions had been met, the parties would meet at a Closing to exchange various documents; after the Closing, further conditions would have to be met, mainly the completion of reclamation within specified time limits, before WICO would actually receive title. "Once reclaimed," Sec. 15(b) of the Memorandum states, "the areas filled shall belong to WICO in fee simple ... provided that WICO is then in compliance with Sections 2 and 8 of this Agreement requiring WICO to fill and provide land for the V.I. Government." Section 15(b) of the Memorandum also contains the following provision:
 
 
 11
 Except as otherwise specifically provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties, their successors and assigns.
 
 
 12
 When the settlement had been reached, public hearings were held. The agreement then went to the Virgin Islands legislature, the Ninth Legislature, for ratification, which was forthcoming in the form of Act No. 3326, passed on October 11, 1972 and formally approved by the Governor on October 30, 1972. Because the Virgin Islands Government was not a party to the underlying suit, its ratification of the settlement took the form of a recommendation to the United States Government to accept and implement the settlement. There is no evidence that the Ninth Legislature acted hastily or without full information and adequate opportunity for public comment in approving the settlement agreement.[3]
 
 
 13
 The Memorandum of Understanding was signed on October 3, 1973 by the United States Government, the Virgin Islands Government, WICO, and the other interested private parties. The Memorandum was filed with the district court, and the Department of the Interior's action was stayed sine die pending completion of the various prerequisites to closing and ultimate transfer of title specified in the Memorandum.
 
 
 14
 The preconditions set by the Memorandum to transfer of title were never fulfilled; the order of events envisioned by the drafters of the Memorandum was altered in several respects. First, in October 5, 1974, the United States passed the 1974 Territorial Submerged Lands Act, 48 U.S.C. Secs. 1705-1708 (1982 & 1987 Supp.). Under this law,
 
 
 15
 [s]ubject to valid existing rights, all right, title, and interest of the United States in lands permanently or periodically covered by tidal waters ... and in artificially made, filled in, or reclaimed lands which were formerly permanently or periodically covered by tidal waters, are hereby conveyed to the governments of Guam, the Virgin Islands, and American Samoa, as the case may be, to be administered in trust for the benefit of the people thereof.
 
 
 16
 48 U.S.C. Sec. 1705(a). To accommodate this change in circumstances, WICO drafted and presented to the Virgin Islands Government a First Addendum to the Memorandum, dated October 28, 1975. This Addendum simply eliminated the first of the two steps of the title transfer procedure. The executive branch of the Virgin Islands Government agreed to this change, and the Virgin Islands Attorney General, considering the change purely procedural, determined that there was no need to submit the First Addendum to the legislature for approval.
 
 
 17
 A second departure from the expected was the enactment, in October of 1978, of the Virgin Islands Coastal Zone Management Act (CZMA), 12 V.I.C. Secs. 901-914 (1982 & 1987 Supp.). The general purpose of the Virgin Islands CZMA was to set up a comprehensive program for the management, conservation, and orderly development of the coastal area; the main method of implementing this program was a permit system run by the Coastal Zone Management Commission, a new unit of the Department of Conservation and Cultural Affairs. The thrust of the CZMA is thus to require those wishing to engage in new development of the coastal area, whether on private or public lands, to obtain a permit to do so from the Virgin Islands Coastal Zone Management Commission. Federal permits for coastal area development in the Virgin Islands must often be obtained in addition to Virgin Islands permits.[4]
 
 
 18
 Section 910 of the CZMA sets forth conditions regarding when a Virgin Islands coastal zone permit is required and may be granted, and outlines the procedures for application. These conditions and procedures apply to both privately- and publicly-held land. However, Sec. 911 imposes stringent additional restrictions and conditions on use or development of public lands. The most important of these additional restrictions, for purposes of this case, are those of Secs. 911(a) and (d). These sections forbid conveyance of publicly-held coastal zone areas to private parties; they require a permit or lease for any development or occupancy of such areas, and limit the term of such permit or lease to a maximum of 20 years.[5] Coastal zone permits for any use of public lands must provide for payment of rental fees; if the permit authorizes dredging, the permit must provide for reclamation fees. Sec. 911(f)(1), (2). Fee schedules are set by the Coastal Zone Management Commission. Sec. 911(f)(3). A coastal zone permit for public lands may be modified or revoked during its term, upon a determination by the Governor that revocation or modification is in the public interest and necessary to prevent significant environmental damage. Sec. 911(g). The CZMA is careful to avoid retroactive effect by specifying that
 
 
 19
 [n]othing herein contained shall be construed to abridge or alter vested rights obtained in a development in the first tier coastal zone prior to the effective date of this chapter or any occupancy permit or lease of trust lands or other submerged or filled lands issued prior to the effective date of this chapter....
 
 Sec. 905(g).[6]
 
 20
 After passage of the CZMA, WICO promptly notified the Virgin Islands Legislature and Governor that it would consider application of the CZMA to it to be a material breach of the Memorandum of Understanding. Negotiations began, and by September of 1981 a compromise had been worked out. The basic terms of this bargain, embodied in a Second Addendum to the Memorandum of Understanding,[7] were that WICO would give up about half of its remaining 30-acre claim in exchange for the Virgin Islands Government's promise to convey to WICO title to the 15 acres left.[8] There are many additional conditions in the Second Addendum. WICO agreed, for example, to specified zoning restrictions and specified limited uses, to a height restriction of three stories, and to reserve a certain percentage of its area for "usable open space." Sec. 11(b). These agreed-upon restrictions, however, apply only to development commenced within ten years of reclamation and completed within 15 years of reclamation; any development not commenced or completed within these time limits, and "any development beyond that explicitly contemplated by this Agreement," is controlled instead by the "then current laws," the CZMA or its future equivalent. Sec. 12(a). In addition, the Second Addendum provides that "as to any matters not specifically covered by the Agreement, such as utilities, siting, performance standards, design and landscape, WICO shall be subject to the requirement of a Coastal Zone Management permit." Sec. 12(b). The Virgin Islands Government, for its part, agreed in the Second Addendum that WICO was not to be subject to the charges mandated by Sec. 911 for rental of or removal of dredge fill from publicly-held lands, and that WICO was to be able to use its land free of the use or rental charges imposed by Sec. 911 on publicly-held land. Sec. 19(e).
 
 
 21
 Like the Memorandum, the Second Addendum provides that after certain conditions are met, a Closing is to be held, at which conveyances and other documents are to be exchanged by the parties; transfer of title is accomplished after further conditions are met, most importantly completion of reclamation. Once WICO begins reclamation, as it has done, time limits within which it must finish apply. The Second Addendum follows the Memorandum in stating that when the specified acreage has been reclaimed, "WICO shall have title to and ownership of the areas filled ... provided that WICO is then in compliance with Section 2 of this Agreement requiring WICO to fill and provide land for the V.I. Government," and that "[e]xcept as otherwise specifically provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties, their successors and assigns." Sec. 16(b). The Second Addendum also specifies that nothing contained in it is to affect the rights of the United States or Virgin Islands Governments to acquire by eminent domain or condemnation the lands covered by the Addendum. Sec. 19(a).
 
 
 22
 A condition of the Second Addendum was that the CZMA be amended to exempt WICO from its provisions insofar as the Addendum replaced or nullified application of those provisions. The CZMA was duly amended by the Fourteenth Legislature on April 7, 1982 by Act No. 4700. Act No. 4700 added the following paragraph to the Coastal Zone Act:
 
 
 23
 (5) any treaty right, grant, or concession which was vested in any party prior to the date of enactment of this chapter and which in whole or in part has been expressly recognized by statute, court order, or lawfully executed agreement as binding on the Government of the Virgin Islands, whether such recognition precedes or succeeds the date of enactment of this chapter, and subject to any agreements or Memorandums of understanding pertaining to such right, grant, or concession which have been or may hereafter be ratified by law.
 
 
 24
 12 V.I.C. Sec. 905(i)(5). In addition, Act No. 4700 ratified the Second Addendum "with the full force and effect of law" and provided that "the Governor and Departments of the Government of the Virgin Islands, and all instrumentalities thereof are authorized and directed, within the scope of their jurisdiction, to execute the terms of such Agreement." App. at 116. Again, as the intervenors themselves maintain, there was no lack of opportunity for public comment on the Second Addendum and on Act No. 4700. See supra note 6.
 
 
 25
 On April 16, 1984, the federal district court, acting sua sponte, entered an order pursuant to Fed.R.Civ.P. 41(b) dismissing for lack of prosecution the 1968 action by the Department of the Interior. No appeal was taken from this dismissal, and no motion to reopen has ever been filed.[9] The intervenors, in connection with the present action, unsuccessfully moved for relief from the dismissal.
 
 
 26
 After the Second Addendum had been ratified and the CZMA amended, WICO began the lengthy process of obtaining permits for reclamation from the United States Army and the Virgin Islands Coastal Zone Management Commission. On March 9, 1983, WICO submitted an application for a federal permit to dredge and fill; WICO received, on February 14, 1985, a permit which would allow it to fill 7.5 acres, but on the condition that archaeological surveys be done prior to the start of any dredging operations.[10] A Virgin Islands permit was granted to WICO without substantial additional study, as the Virgin Islands Government considered itself bound by the Second Addendum and Act No. 4700 to allow WICO to proceed pursuant to the terms and limitations of that agreement. After doing the required archaeological surveys, WICO began dredging in June of 1986.
 
 
 27
 WICO's dredging operations created an immediate public uproar. In response, the Sixteenth Legislature called itself into special session and on July 9, 1986 approved a bill to repeal Acts No. 3326 and 4700. The Governor vetoed the bill, deploring the action to abrogate the "long-standing agreement to permit the limited further development of an already heavily developed harborfront at Long Bay." App. at 131. The Legislature, again in special session, overrode the veto on August 11, 1986 to make the Repeal Act, Act No. 5188, law. Section 1 of the Repeal Act rescinds the two earlier measures, Acts No. 3326 and 4700, in their entirety; Section 2 provides that
 
 
 28
 Any and all activities that are conducted in Long Bay by the West Indian Company, Ltd., shall comply with the provisions of the Coastal Zone Management Act, Title 12, Chapter 21, Virgin Islands Code. Any permit for the development or occupancy of the submerged lands in Long Bay must be sent to the Governor for approval and the Legislature for ratification.
 
 
 29
 App. at 130.[11] On August 18, 1986, the Virgin Islands Department of Conservation and Cultural Affairs issued a stop order to WICO on the ground that the permit already issued to WICO was no longer valid in light of the Repeal Act.
 
 
 30
 On August 14, 1986, WICO filed suit in the district court in the Virgin Islands seeking a temporary restraining order and a preliminary injunction against enforcement of the Repeal Act. A hearing on this motion was held on August 19, 1986, and a temporary restraining order forbidding any interference with WICO's dredging was granted at that time. A hearing on the preliminary injunction was scheduled for August 26, 1986.
 
 
 31
 At the August 14th hearing, the Virgin Islands Attorney General made a special appearance to advise the court that the executive branch of the Virgin Islands Government intended to decline to defend the suit, and to request the court's permission for the executive not to appear in the case. Because the executive branch considered the Repeal Act invalid, the Attorney General argued, appearance would violate Fed.R.Civ.P. 11 and constitute a breach of the Canon of Ethics. The court allowed the executive branch to bow out, not because of the ethics-based arguments but because it believed that for a federal court to force the executive to defend would constitute unwarranted interference in the political affairs of the Virgin Islands Government. The court then permitted the Legislature, and officers of several citizen groups supporting the Repeal Act, to intervene.[12] The citizen intervenors promptly moved to compel the Attorney General to hire outside counsel to represent the Virgin Islands Government in the suit; this motion was denied. The citizen intervenors then filed cross-claims against both the executive and legislative branches of their government, charging that the Government's agreement to the Memorandum and Addenda constituted a breach of fiduciary duty and a violation of the citizens' constitutional rights. The claim against the legislative branch has since been dropped, but the citizen intervenors' claim against the executive branch remains. The citizen intervenors assert that the executive branch, for various reasons, should be required to pay the citizens' attorneys' fees and costs, plus any costs awarded to WICO.
 
 
 32
 At the August 26th hearing, the district court found that WICO had established a likelihood that it would prevail on the merits of its claim that the Repeal Act was an unconstitutional violation of the contract clause, that WICO would suffer irreparable harm absent issuance of an injunction, and that an injunction would be in the public interest. Based on these findings, the district court granted WICO's request for a preliminary injunction. West Indian Co., Ltd. v. Government of the Virgin Islands, 643 F.Supp. 869 (D.V.I.1986). On appeal, this court, employing the narrow scope of review applicable in appeals from the issuance of a preliminary injunction, affirmed the decision of the district court. West Indian Co., Ltd. v. Government of the Virgin Islands, 812 F.2d 134 (3d Cir.1987) (per curiam).
 
 
 33
 The district court granted summary judgment to WICO on April 13, 1987, converting the preliminary injunction into a permanent injunction. West Indian Co., Ltd. v. Government of the Virgin Islands, 658 F.Supp. 619 (D.V.I.1987).
 
 
 34
 The intervenors appeal from the grant of summary judgment and a permanent injunction. Making substantially the same arguments here as before the district court, they contend, inter alia, that United States courts lack jurisdiction over this matter; that summary judgment was inappropriate; that there is no contract and thus no contract clause violation; that the public trust doctrine barred formation of a valid contract to convey title to any submerged land to WICO; and that the Repeal Act is a valid use of police power and, as such, withstands WICO's contract clause challenge. The intervenors also appeal from dismissal of their cross-claim against the executive branch. WICO reasserts on appeal both the contract clause argument with which it prevailed on summary judgment and a takings claim not reached by the district court.
 
 II.
 
 35
 The intervenors challenge the exercise of subject matter jurisdiction by the district court, arguing that all rights of WICO arise under the 1917 Convention of Cession between the United States and Denmark and are therefore subject to the Convention's provision for dispute resolution.[13] We disagree. What is at issue in this action is not the nature of the original grant to WICO, preserved in the Convention of Cession, but rather the nature of the agreements negotiated between WICO and the Virgin Islands Government.[14] The determinative nature of the recent agreements, in particular the Second Addendum, will be evident from our discussion of the merits; it is also evident, we think, simply from the Repeal Act itself, which has nothing to do with the Convention of Cession but is directed to negating the Memorandum and Second Addendum. Constitutional issues arising in connection with the status of agreements made between a Virgin Islands corporation and the Virgin Islands Government, and dealing with rights to and uses of land located within the Virgin Islands, clearly fall within the subject matter jurisdiction of the District Court for the Virgin Islands. 48 U.S.C. Sec. 1612; 4 V.I.C. Sec. 32. Therefore, the district court properly exercised jurisdiction, and there is appellate jurisdiction in this court pursuant to 28 U.S.C. Secs. 1291 and 1294(3).
 
 III.
 
 36
 In determining whether a grant of summary judgment was appropriate, we must determine whether, viewing all reasonable inferences that may be drawn from the evidence in the light most favorable to the intervenors, no genuine issue of material fact exists and WICO is entitled to summary judgment as a matter of law. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). The Supreme Court recently offered the following guidance for identification of material facts:
 
 
 37
 As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.
 
 
 38
 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 39
 In this case, the intervenors argue that they are entitled to summary judgment, and that summary judgment was improperly granted to WICO because material facts are in dispute. Items listed as disputed material facts by the intervenors include the proper translation and meaning of the terms used in the 1913 letters from the Danish Government to WICO; the intent of the parties to the 1913 letters as to the length of the grant of rights to WICO; whether the United States failed to assert the public's equitable interest in the area claimed by WICO; and whether the area claimed by WICO was being used for public trust purposes prior to WICO's dredging. As will be clear from our analysis of the substantive law applicable in this matter, disputes over these and other items claimed by the intervenors to be material facts are not "disputes over a fact that might affect the outcome of the suit under the governing law" and thus do not preclude summary judgment under the standard set forth by the Court in Anderson.
 
 IV.
 
 40
 We now turn to the merits of this case. The first and most important of the issues we confront is whether or not there is a contract between WICO and the Virgin Islands Government, and whether the Repeal Act impairs that contract so as to conflict with the bar set by Article I, Sec. 10, cl. 1 of the United States Constitution, incorporated by Sec. 3 of the Revised Organic Act of the Virgin Islands, 48 U.S.C. Sec. 1561, against any law "impairing the Obligation of Contracts."
 
 
 41
 In discussing this issue, the Supreme Court has said:
 
 
 42
 In general, a statute is itself treated as a contract when the language and the circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State.
 
 
 43
 United States Trust Co. v. New Jersey, 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92 (1977).[15] We therefore look to the language and circumstances of the agreements between the Virgin Islands Government and WICO to determine whether they evince the requisite intent to create private contractual rights in WICO enforceable against the Virgin Islands Government.
 
 
 44
 We begin with, and need go no further back than, the most recent agreement, the Second Addendum. Negotiated and ratified after title to the submerged lands had been transferred to the Virgin Islands and after the Virgin Islands CZMA had been passed, the Second Addendum is, in our view, the definitive agreement between WICO and the Virgin Islands Government. It is clear that both sides compromised legitimate claims in reaching this agreement. Clearly the Virgin Islands Government achieved significant benefits for itself. WICO traded a full half of its claimed acreage for definite recognition of its right to obtain title to the remainder, an area of only 15 acres or so. WICO also assumed a number of other obligations, and agreed to many conditions on the use and development of its land. The Second Addendum contains time limits within which WICO bound itself to act, and limits the number of years during which new development by WICO is not covered by the normal requirements of the CZMA. WICO has fully complied with, and has acted in reliance on, the Second Addendum; until pressure by the public in 1986 led to the passage of the Repeal Act, the Virgin Islands Government also acted in accordance with the Second Addendum and considered it binding.[16] In addition to these circumstances, which seem to us to indicate legislative intent to enter into a binding contract with WICO, the language with which the Second Addendum concludes must not be overlooked:
 
 
 45
 Except as otherwise specifically provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties, their successors and assigns.
 
 
 46
 Sec. 16(b). Act No. 4700, the measure with which the Virgin Islands legislature ratified the Second Addendum after extensive debate and opportunity for public comment, not only amended the CZMA to recognize WICO's rights, but gave the Addendum "the full force and effect of law" and directed all officials and instrumentalities of the Virgin Islands Government to execute the Addendum's terms.
 
 
 47
 We conclude that there is unambiguous evidence here of legislative intent to create enforceable private rights in WICO and that the Second Addendum was intended by all concerned to be a binding contract between WICO and the Virgin Islands Government.[17]
 
 V.
 
 48
 The intervenors contend that the public trust doctrine prevented the formation of any valid contract by Virgin Islands officials to convey submerged tideland to WICO. They make two arguments in support of this contention: first, that because the 1974 U.S. Territorial Submerged Lands Act conveyed all submerged lands to the Virgin Islands in an express trust, Virgin Islands officials had no authority to agree to convey any submerged lands out of trust to WICO; and second, that because the submerged lands in question here were always held in trust for the public under the common law, the lands could not be conveyed out of trust to WICO.
 
 
 49
 The first of these arguments need not long detain us. The Submerged Lands Act, passed in 1974, does indeed convey the submerged lands in trust, but does so "subject to existing rights." Existing rights include the right of WICO to reclaim and take title to at least 30 acres of specified submerged lands, as negotiated and agreed upon in 1973 by both the United States and Virgin Islands Governments in the Memorandum of Understanding. Given this explicit exception, the Submerged Lands Act cannot be held to create a trust that would prevent conveyance to WICO, pursuant to an amendment of the Memorandum, of a maximum of about 15 acres of the specified submerged lands.
 
 
 50
 The second basis for the intervenors' public trust argument, the common law public trust doctrine, deserves more attention. In evaluating this argument we look to the "rules of common law ... as generally understood and applied in the United States."[18] We begin with the leading case of Illinois Central Ry. Co. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). There, the state legislature had transferred ownership of the submerged area of the entire waterfront of Chicago, over 1000 acres, to the railroad; four years later, a new legislature sought to revoke the transfer, and was challenged by the railroad. The revocation was upheld by the Court, which described title to the land under the harbor as:
 
 
 51
 different in character from that which the state holds in lands intended for sale. It is different from the title which the United States holds in public lands which are open to preemption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have the liberty of fishing therein freed from the obstruction or interference of private parties.
 
 146 U.S. at 452, 13 S.Ct. at 118.[19]
 
 52
 Submerged lands are thus impressed with a trust for the benefit of the public, and the sovereign's use and disposition of those lands must be consistent with that trust. This does not mean, however, that a sovereign may under no circumstances convey submerged lands to a private party. To the contrary, the Supreme Court in the Illinois Central case expressly noted that alienation in furtherance of trust purposes was permissible:
 
 
 53
 The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the land and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled.
 
 
 54
 146 U.S. at 452-53, 13 S.Ct. at 118.
 
 
 55
 These same principles were reconfirmed by the Supreme Court two years later in the context of congressional action regarding land as to which the sovereign prerogative belongs to the federal government:
 
 
 56
 We cannot doubt, therefore, that Congress has the power to make grants of land below high water mark of navigable waters in any Territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory.
 
 
 57
 Shively v. Bowlby, 152 U.S. 1, 47-48, 14 S.Ct. 548, 565-66, 38 L.Ed. 331 (1894).[20]
 
 
 58
 While the common law public trust doctrine varies from state to state and has been altered by statute and in a number of state constitutions, see Phillips Petroleum Co. v. Mississippi, --- U.S. ----, 108 S.Ct. 791, 794, 98 L.Ed.2d 877 (1988), the doctrine has developed in a manner consistent with the analysis of Illinois Central and Shively. The courts carefully scrutinize any conveyance of submerged lands to determine if it is in complete congruence with the fiduciary obligations owed to the public by the sovereign. If the conveyance represents a deliberate and reasonable decision of the sovereign that the transaction of which the conveyance is a part affirmatively promotes the public interest in the submerged lands, the courts have deferred to the sovereign's decision. See Sax, The Public Trust Doctrine in Natural Resource Law, 68 Mich.L.Rev. 471 (1970); W. Rodgers, Environmental Law Sec. 2.16 (1977); 1 V. Yannecone & B. Cohen, Environmental Rights and Remedies Sec. 2.3 (1972). Accordingly, the issue before us is whether, in 1982, the Virgin Islands legislature's ratification of the Second Addendum was consistent with its fiduciary obligation to manage and control the lands beneath the harbor at Charlotte Amalie for the benefit of the public. We hold that its ratification was in furtherance, not in derogation, of that obligation, and therefore sustain the validity of its action.
 
 
 59
 In 1982, the Virgin Islands legislature was confronted with a bona fide dispute over the issue of whether WICO had continuing rights in up to 42 acres of submerged land in the harbor. WICO's claim rested on a conveyance from the Danish government, alleged to be perpetuity, which predated the transfer of the Islands to the United States and which the Convention of Cession called for the United States to consummate through a fee simple conveyance; if that claim were adjudicated in its favor, WICO would be entitled upon reclamation to fee simple title to all 42 acres free of any public trust. This would follow not only from the well-established principle that submerged lands may be conveyed free of trust to satisfy international obligations, Shively, supra; Montana v. United States, 450 U.S. 544, 551-52, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493 (1981), reh'g denied 452 U.S. 911, 101 S.Ct. 3042, 69 L.Ed.2d 414, but also the holding of Knight v. United States Land Ass'n, 142 U.S. 161, 183-84, 12 S.Ct. 258, 264-65, 35 L.Ed. 974 (1891), that the public trust doctrine "does not apply to lands that had been previously granted to other parties by the former government, or subjected to trusts which would require their disposition in some other way."
 
 
 60
 Though confronted with the possibility, if not the probability, that the sovereign and its public beneficiaries would wind up with no interest in the disputed 42 acres, the legislature had available an attractive alternative in the Second Addendum, negotiated with WICO by the Virgin Islands executive. By ratifying that agreement, the legislature, first and foremost, could remove the cloud from the title to all but 15 of the disputed acres, making sure that those lands would henceforth be impressed with a public trust. This would allow planning for the development of the harbor in the public interest to go forward on a timely basis, unhindered by uncertainties about ownership rights and future litigation.
 
 
 61
 While the greatest, this was not the only incentive the legislature had to exercise its fiduciary discretion in favor of the proposed settlement. Under the Second Addendum, WICO was to make a substantial contribution to the development of the harbor.[21] As the district court noted, the Memorandum explained that the settlement would "satisfy a compelling public need" in the following respects:
 
 
 62
 (1) An additional 2- 1/2 acres will be added by WICO to the public recreation area near Pearson Garden, thus doubling its size;
 
 
 63
 (2) Filled land for the waterfront highway to permit widening from two to four lanes will be provided by WICO.
 
 
 64
 (3) Dredging the harbor in Long Bay will be provided by WICO, thereby benefiting navigation and promoting tourism;
 
 
 65
 (4) The reclamation will enlarge the area of level land for development near the downtown area of Charlotte Amalie now limited because of the hilly terrain;
 
 
 66
 (5) The development contemplated on the reclaimed lands for marinas, cruise ship berths, offices and other like facilities will provide additional employment for residents of St. Thomas and enhance tourism facilities....
 
 
 67
 643 F.Supp. at 878.
 
 
 68
 Finally, the record shows no reason for the legislature to have thought that the proposed settlement would in any way impair its ability to manage and control the harbor in the future for the benefit of the public. The basin in which the disputed acreage is located is approximately 400 acres in area, and this basin is only a part of the total harbor. The lands to be conveyed to WICO under the Second Addendum thus constitute a small fraction of the harbor. Moreover, the provisions of that agreement assured the legislature that WICO's development of its acreage would be limited in scope and would not substantially interfere with navigation or commerce. The absence of any such substantial interference was also ensured by the federal permit requirement, and is evidenced by the actions of the permitting authorities in allowing WICO to proceed with the development as it has done.
 
 
 69
 Given these circumstances, we cannot fault the legislature's decision to approve the Second Addendum. Approval was clearly consistent with the fiduciary obligations of the legislature. For this reason, we conclude that the public trust doctrine did not bar the formation of a valid contract involving the conveyance of 15 acres of submerged land to WICO.
 
 V.
 
 70
 The intervenors' final argument in support of the Repeal Act is that the Act is a valid use of the police power, and that the police power cannot be limited by contract. We find this argument unpersuasive. Although the prohibition of the contract clause is circumscribed, often sharply, by the inherent police power of the state, there are limits to this circumscription. Police power, the Supreme Court has said,
 
 
 71
 is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort, and general welfare of the people, and is paramount to any rights under contract between individuals.... If the Contract Clause is to retain any meaning at all, however, it must be understood to impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power.
 
 
 72
 Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241-42, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978), reh'g denied 439 U.S. 886, 99 S.Ct. 233, 58 L.Ed.2d 201 (1978); see also Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 703, 74 L.Ed.2d 569 (1983).[22]
 
 
 73
 In Energy Reserves, the Supreme Court set forth a three-step analysis to be used in cases where contract clause claims must be balanced against legislation passed in exercise of police power:
 
 
 74
 The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." ... If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation ... such as the remedying of a broad and general social or economic problem.... Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." ... Unless the State itself is a contracting party ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.
 
 
 75
 459 U.S. at 411-12, 103 S.Ct. at 704-05 (citations omitted). This court recently applied the Energy Reserves analysis in Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1243 (3d Cir.1987) (amendment of Virgin Islands Workmen's Compensation Act to retroactively eliminate application of the "borrowed employee" doctrine as a bar to pending tort suits constituted unjustified impairment of contract), and we will now apply it here.
 
 
 76
 We have already found that the Second Addendum constitutes a contract between WICO and the Virgin Islands Government; we begin here with the question whether the contract contained in the Second Addendum is substantially impaired by the Repeal Act. There can be no doubt that it is. Under the Second Addendum, WICO "shall have title to and ownership of the areas filled"; WICO may use its reclaimed land free of rental charges; and WICO is subject, for a limited time, to development restrictions contained in the contract rather than those of the CZMA. If the Repeal Act is enforced, however, WICO will be reduced to the status of a mere applicant for a permit under the CZMA; WICO will never take title to the areas it fills, if it is allowed to fill any; WICO will always have to pay rental charges for use of any land it is allowed to reclaim; and WICO will be subject to all the restrictions of the CZMA, including the requirement that any permit it obtains be ratified by the legislature and approved by the governor. Clearly, WICO's contract rights are gravely impaired, to the point of virtual annihilation, by the Repeal Act. That the coastal zone area is generally subject to considerable regulation does not, in our view, lessen the severity of the impairment of WICO's contract rights.
 
 
 77
 Turning to the second step of the analysis, we find the Repeal Act's purpose too narrow in scope to justify the substantial impairment that it effects. Although it may be said that the Repeal Act is addressed to the public interest in the sense that it provides no benefit to special private interests, abrogating the contract with WICO and retaining title, albeit a heavily clouded one, to the 15 acres of submerged land at issue is not a "significant" public purpose, and is by no stretch of the imagination a remedy for a "broad or general social or economic problem." The Repeal Act is by its own terms directed at a single company and a single 15-acre area. In this way, it is similar to the legislation we struck down in Nieves, which we found to be directed at a single company, and similar to the legislation struck down by the Court in Allied Structural Steel. The following considerations discussed in Allied Structural Steel are apposite here:
 
 
 78
 This Minnesota law simply does not possess the attributes of those state laws that have in the past survived challenge under the Contract Clause of the Constitution. The law was not even purportedly enacted to deal with a broad, generalized economic or social problem.... It did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken.... It did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships--irrevocably and retroactively.... And its narrow aim was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees.
 
 
 79
 438 U.S. at 250, 98 S.Ct. at 2725. In this instance, the legislation is even narrower in scope than the Minnesota legislation found objectionable by the Court. Accordingly, we conclude that the Repeal Act cannot be justified by a significant public purpose.
 
 
 80
 The final step of the analysis calls for us to determine whether the Repeal Act's adjustment of WICO's rights is a reasonable and appropriate accommodation in light of any legitimate public purpose supporting the Act. Because the Virgin Islands Government is a party to the contract, we need not defer to the judgment of the Sixteenth Legislature, but "may inquire whether a less drastic alteration of contract rights could achieve the same purpose and whether the law is reasonable in light of changed circumstances." Nieves, 819 F.2d at 1243. Since we have found no legitimate public purpose supporting the Repeal Act, we need not reach this final step. With respect to the reasonableness of the Repeal Act, however, we note that the Sixteenth Legislature did not even purport to base its action upon any facts or circumstances not existing and well known to its predecessor at the time the Second Addendum was approved. The only circumstance that has arguably changed since 1982 is the force of public opinion.
 
 
 81
 We hold only that the Repeal Act is invalid. We do not, of course, hold that the police power of the Virgin Islands with respect to WICO's 15 acres was exhausted when the Second Addendum was approved. WICO is obviously not immune from generally applicable police power measures not inconsistent with the Second Addendum. Moreover, if conditions materially change so as to create a substantial problem that could not be foreseen in 1982, it may be that generally applicable land use regulations could validly alter the manner in which WICO may utilize its property. We are not at present confronted with such an issue, however, and express no opinion with respect to it.
 
 VI.
 
 82
 The remaining issue is the intervenors' claim against the executive branch of the Virgin Islands Government.[23] The citizen intervenors now contend that the executive branch, by declining to defend this suit or hire outside counsel to defend it, breached its fiduciary duty and violated the citizens' constitutional rights.
 
 
 83
 We agree with the district court that the Virgin Islands executive owed the intervenors no duty to defend this suit or to hire outside counsel to do so. The statute cited by the intervenors as imposing on the executive branch a duty to represent the Government, 3 V.I.C. Sec. 114, provides only that the Virgin Islands Attorney General is to represent the executive branch of the Virgin Islands Government; this does not say or mean that the executive branch must defend whenever the Virgin Islands Government is sued. There is simply no authority for the intervenors' contention that the executive branch of a territorial government must defend a challenge to the constitutionality of an act of its territorial legislature when the executive branch is of the view that the legislative action is constitutionally infirm.[24] We decline to establish such a precedent.
 
 VII.
 
 84
 For the foregoing reasons, we will affirm the grant of summary judgment and a permanent injunction to WICO, as well as the dismissal of the citizen intervenors' cross-claim against the executive branch of the Virgin Islands Government.
 
 
 
 [1]
 The Danish Government had originally granted a similar concession to a consortium of Danish businessmen. The consortium proved unable to meet the conditions of its concession, however, and its rights were transferred by the Danish Government to WICO in the 1913 grant, with certain modifications
 
 
 [2]
 The Danish Government also informed the United States at this time that because WICO had begun to exercise its rights by doing some reclamation, WICO's rights had vested under Danish law
 
 
 [3]
 In fact, the opposite appears true. One of the intervenors, discussing the passage of Acts No. 3326 and 4700, asserts that:
 If any records were preserved, it [sic] would readily reflect that the League of Women Voters of the Virgin Islands and the Virgin Islands Conservation Society have always made appearances and have voiced strong objection to any dredging in St. Thomas Harbor.... Despite the vocal opposition to the dredging ... prior legislation was nevertheless enacted....
 Gjessing Br. at 23-24. Others of the intervenors state that from the time of the proposed settlement agreement on, "vigorous public opposition has been voiced by individuals and citizen groups." Moolenaar/Reed Br. at 10.
 
 
 [4]
 In this case, for example, WICO's operations fall within 33 U.S.C. Sec. 403, requiring federal approval for any excavation or fill within navigable waters, and 33 U.S.C. Sec. 1344, requiring federal permits for discharge of dredged or fill material into navigable waters, and possibly within 33 U.S.C. Sec. 1341, requiring federal permits for any discharge into navigable waters. Section 910(g) of the Virgin Islands CZMA states that where any development or occupancy in the coastal zone "requires separate and distinct approval from the United States Government or any agency ... thereof," the Virgin Islands "coastal zone permit shall be contingent upon receipt of all other such permits and approvals, and no such development or occupancy shall commence prior to receipt of all such permits and approvals."
 
 
 [5]
 A coastal zone permit that includes an occupancy or development permit, Sec. 911(d)(1) provides, "shall not constitute a property right and shall be renewable only if the requirements of this section ... are satisfied"; a coastal zone permit that includes an occupancy or development lease, Sec. 911(d)(2) provides, "shall only be granted for a particular parcel of filled land and for a nonrenewable lease period of not more than 20 years."
 
 
 [6]
 The "first tier" is defined as "that area extending landward from the outer limit of the territorial sea ... to distances inland as specified in the maps incorporated by reference...." Sec. 902(r). WICO's grant area would apparently fall within the first tier
 
 
 [7]
 The Second Addendum amended and restated the Memorandum of Understanding as amended by the First Addendum. As it incorporates the entire agreement of the parties, no reference back to the Memorandum is necessary
 
 
 [8]
 According to the intervenors, the eastern anchorage of St. Thomas harbor, the basin in which WICO's 15 acres are located, is about 400 acres. Moolenaar/Reed Br. at 3
 
 
 [9]
 The intervenors' claim that the U.S. Department of Justice "protested the dismissal as error" is not well founded. The October 6, 1984 letter sent by the U.S. Attorney to the district court on this matter was "solely for [the court's] information and for no other purpose"; it informed the court that the Justice Department was in touch with the Interior Department
 to determine whether the federal government has any present interest in reopening the litigation. When the Department of the Interior has completed its review and consideration of this matter, this office will take any appropriate action.
 App. at 699. No further action was taken.
 
 
 [10]
 The Army permit only covers WICO's dredging and filling. It notes as "special conditions" not only the requirement that archaeological surveys be conducted prior to dredging, but also that another permit application be submitted to the Department of the Army for review prior to the construction by WICO of a marina on the filled land. The Army permit also repeats the requirement of the Second Addendum that the final plans for proposed development over the filled area be submitted to the Virgin Islands Department of Cultural and Conservation Affairs for review of siting, design, and the like
 
 
 [11]
 The CZMA mandates that CZMA permits for development or occupancy of publicly-held coastal areas be sent to the Governor for approval and the legislature for ratification; if the legislature is not in session, the Committee on Conservation, Recreation, and Cultural Affairs may ratify a permit. Sec. 911(e)
 
 
 [12]
 These officers include Helen Gjessing, president of Save Long Bay Coalition, Inc.; Lucien Moolenaar, president of Virgin Islands 2000, Inc.; Ruth Moolenaar, director of the St. Thomas Historical Trust, Inc.; Leonard Reed, president of the Virgin Islands Conservation Society, Inc.; and Kate Stull, president of the League of Women Voters of the Virgin Islands, Inc. All intervene in their personal capacities as well as their capacities as corporate officers
 
 
 [13]
 The Convention provides that disputes unresolvable by negotiation between Denmark and the United States are to be brought before the Permanent Court of Arbitration at the Hague, which is still extant
 
 
 [14]
 We do not accept the intervenors' argument that the Memorandum and Second Addendum are invalid as attempts to modify the Convention of Cession. The Convention created a right in WICO to have the United States Government respect its original grant; surely WICO and the United States Government (or its successor in interest, the Virgin Islands Government) can subsequently negotiate a valid contract of settlement concerning the extent of WICO's rights
 
 
 [15]
 The Virgin Islands Government, although it remains an unincorporated territory lacking the sovereignty of a state, is treated like a state government as far as its contractual obligations are concerned. We have often recognized that the Revised Organic Act conferred upon the Virgin Islands "attributes of autonomy" similar though not equal to the full autonomy enjoyed by state governments. See, e.g., Water Isle Hotel v. Kon Tiki St. Thomas, Inc., 795 F.2d 325, 327 (3d Cir.1986); In re Hooper's Estate, 359 F.2d 569, 578 (3d Cir.1966), cert. denied 385 U.S. 903, 87 S.Ct. 206, 17 L.Ed.2d 133; Harris v. Municipality of St. Thomas and St. John, 212 F.2d 323, 327 (3d Cir.1954). The attributes of autonomy relevant to this contract dispute are the authority to enter into binding contracts and to sue and be sued on those contracts; that the Virgin Islands Government has this authority cannot be gainsaid. See 48 U.S.C. Sec. 1541
 
 
 [16]
 We share the following view expressed by the district court:
 [A]s of August, 1986, three successive elected governors, their respective attorneys general, and two separate Legislatures of the Virgin Islands have recognized WICO's rights to dredge and reclaim certain submerged lands in the harbor of Charlotte Amalie. The various officials described above successfully negotiated limits with respect to both acreage and time as to WICO's rights, and gained important concessions in favor of the territory. The reason for this case is that the Sixteenth Legislature, now sitting, takes issue with the validity of the actions undertaken by the territorial officials above described.
 
 
 [643]
 F.Supp. at 873
 
 
 [17]
 Because we view the Second Addendum as definitively establishing contractual rights in WICO, we consider irrelevant the arguments made by the intervenors based on the rule against perpetuities and on alleged improper dismissal of the 1968 lawsuit. The intervenors assert that the 1913 grant of rights to WICO was in violation of the rule against perpetuities and, accordingly, invalid. We doubt that the act of a sovereign like Denmark's concession to WICO can violate the rule against perpetuities but we need not resolve that issue. WICO's rights under that concession were bargained away in the ensuing settlement negotiations and the rights it currently possesses arise out of the contract entered into in 1982 by WICO and the Virgin Islands Government. Similarly, the 1968 lawsuit by the Department of the Interior had been pending sine die for almost a decade when the Second Addendum was signed; we agree with the district court that the 1968 suit was properly dismissed and had no further bearing on the relationship between WICO and the Virgin Islands Government
 
 
 [18]
 Under 1 V.I.C. Sec. 4, the "rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply in the absence of local laws to the contrary." The common law public trust doctrine is not expressed in a restatement. Moreover, when the Virgin Islands legislature approved the Second Addendum in 1982, there were no relevant local laws. While the CZMA had been enacted in 1978, the legislation ratifying the Second Addendum amended that statute to grant grandfather status to rights, like WICO's, that had been recognized by legislative action
 
 
 [19]
 There are a number of still older Supreme Court cases establishing that the United States, on acquiring territory, holds title to tidal lands in trust to be transferred to future states or territorial governments. See, e.g., Weber v. Harbor Commissioners, 85 U.S. (18 Wall.) 57, 65, 21 L.Ed. 798 (1873); Pollard's Lessee v. Hagan, 44 U.S. (3 How.) 212, 229, 11 L.Ed. 565 (1845)
 
 
 [20]
 When the federal government of the United States came into being, it held sovereign power, and had concomitant fiduciary duties, with respect to all public trust lands not already subject to the sovereignty of the original states. When the United States subsequently acquired more territory, the federal government held all submerged and tidal lands within the newly acquired acreage in trust, for future transfer to states; as new states came into being, they replaced the federal government as sovereign and fiduciary. Under the Constitution, of course, Congress has a paramount interest in the areas of navigation and commerce, and paramount powers to take action necessary to fulfill international obligations. With regard to submerged and tidal lands, the status of the Virgin Islands, as previously noted, is somewhat different from that of the states; the Virgin Islands did not acquire sovereign power over trust land within its borders by means of statehood, but rather through transfer by Congress pursuant to the 1974 Territorial Submerged Lands Act. With the Submerged Lands Act, Congress turned over to the Virgin Islands Government both sovereign power and fiduciary obligations with respect to public trust lands within the Virgin Islands
 
 
 [21]
 Harbor development, as we have noted, has consistently been recognized as a legitimate public purpose for which submerged land may be conveyed out of trust. E.g., Appleby v. New York, 271 U.S. 364, 399, 46 S.Ct. 569, 579, 70 L.Ed. 992 (1926) (overturning on contract clause grounds New York's attempted invalidation of a grant of title to roughly 18 acres of submerged ground for purpose of harbor development); City of Milwaukee v. State, 193 Wisc. 423, 214 N.W. 820 (1927) (Milwaukee allowed to convey out of trust, for purpose of harbor development, land ceded to Milwaukee by state)
 
 
 [22]
 It is not disputed that the Virgin Islands Government has police power similar to that of a state
 
 
 [23]
 The intervenors filed a cross-claim under Fed.R.Civ.P. 13(g) against the executive branch; as Rule 13(g) applies only to co-parties, and neither the "executive branch" nor any members thereof are parties to this action, this filing cannot be correct. However, the procedural irregularity may be ignored in light of our conclusion on this issue
 
 
 [24]
 This is not a rare situation. See, e.g., Karcher v. May, --- U.S. ----, 108 S.Ct. 388, 391, 98 L.Ed.2d 327 (1987) (presiding officers of New Jersey legislature sought and obtained permission to intervene when neither state attorney general nor other named defendants would defend minute-of-silence statute passed over governor's veto). Accordingly, we find the absence of any authority for the intervenors' position significant