# GENERAL OFFSHORE CORPORATION

v.

## GOVERNOR ALEXANDER FARRELLY, Governor of the United States Virgin Islands; PAUL ARNOLD, Commissioner of Labor of the United States Virgin Islands; GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS

Civil No. 147/1988

District Court of the Virgin Islands

Div. of St. Croix

August 6, 1990

227

JOHN R. COON, St. Croix, V.I., *for plaintiff*

DARYL DODSON, Assistant Attorney General, St. Thomas, V.I., *for defendant*

CAHN, *Judge*

## MEMORANDUM OPINION

The plaintiff, General Offshore Corporation, seeks declaratory and injunctive relief from this court, claiming that the Virgin Islands Wrongful Discharge Act, V.I. Code Ann. tit. 24, §§ 76–79 (Supp. 1989) [hereinafter VIWDA], violates various portions of the United States Constitution made applicable to the Virgin Islands by the Revised Organic Act of 1954, 48 U.S.C. § 1561. The parties have filed

cross-motions for summary judgment.[1] For the reasons below, this court grants the defendants' motion insofar as it addresses a facial challenge to the VIWDA, and dismisses this action as unripe insofar as it mounts an "as applied" challenge.

## I. BACKGROUND

This action stems from the Territorial Legislature's enactment of Act No. 5227 on December 29, 1986. This act, the VIWDA, sets forth a list of reasons for which an employer might dismiss an employee. V.I. Code Ann. tit. 24, § 76(a) (Supp. 1989). The Commissioner of Labor is also empowered to adopt other grounds by rule or regulation. V.I. Code Ann. tit. 24, § 76(b) (Supp. 1989). Otherwise, only economic hardship, going out of business, or unprotected concerted activity can warrant discharge. V.I. Code Ann. tit. 24, § 76(c) (Supp. 1989). An employee believing himself wrongfully discharged is given a choice of remedies. He may file suit in the appropriate court for compensatory and punitive damages, as well as attorney's fees and costs. V.I. Code Ann. tit. 24, § 79 (Supp. 1989).

Instead, or in addition, an employee may file a complaint before the Commissioner within thirty days of discharge. V.I. Code Ann. tit. 24, § 77(a) (Supp. 1989). The Commissioner then serves the complaint and schedules a hearing, set for ten days after the complaint is served. V.I. Code Ann. tit. 24, § 77(b) (Supp. 1989). The Commissioner may set forth the applicable rules of evidence. Id. If the Commissioner finds that the discharge is wrongful, he shall issue an order directing the employer to reinstate the employee with back pay. V.I. Code Ann. tit. 24, § 77(c) (Supp. 1989). Such orders are appealable to Territorial Court. V.I. Code Ann tit. 24, § 78 (Supp. 1989).

On November 6, 1986, shortly before the statute was enacted, Gordon Martin II was hired by General Offshore. Complaint, Exh. A. He passed his probationary period, and received several satisfactory work appraisals. Id. However, on May 21, 1987, General Offshore fired him. Id. On June 8, 1987, Martin filed a complaint with the Commissioner, alleging that he was discharged because he was an active member of the Virgin Islands National Guard and hence that his

---

[1] Although the government's motion was initially styled a motion to dismiss, the government suggests that its motion is properly a motion for summary judgment. This court agrees.

232

discharge was wrongful.[2] Id. The Commissioner sent a letter to General Offshore on October 7, 1987, which stated that Martin had filed a complaint alleging wrongful discharge with the Commissioner and that a copy of the complaint and a notice of hearing would be sent later. Complaint, Exh. B. On March 11, 1988, the Commissioner sent a copy of the complaint to General Offshore, along with a notice that a hearing was scheduled for March 23, 1988. Complaint, Exh. C. This hearing was later rescheduled for May 20, 1988. Complaint, Exh. D. After filing an objection to the hearing with the Commissioner (Complaint, Exh. E), General Offshore filed the complaint in this action. The administrative hearing has not taken place.

■■ The complaint contains three counts. Count I requests injunctive relief, stating that the VIWDA violates the Revised Organic Act of 1954 by impairing General Offshore's contractual obligations and effecting a taking of General Offshore's property without due process of law, and that the Commissioner violates General Offshore's procedural due process rights by failing properly to set forth regulations effecting the statute. Complaint, ¶¶ 17–22. Count II requests an injunction under 42 U.S.C. §§ 1981, 1983, and 1985. It states that the defendants have acted under color of law to violate General Offshore's due process and equal protection rights and to impair General Offshore's contracts. Complaint, ¶¶ 24–25. Finally, Count III states that the defendants have impaired General Offshore's contractual obligations, deprived General Offshore of its property without due process of law, and denied General Offshore its procedural due process rights. Complaint, ¶ 30. It also states that the VIWDA is preempted by federal labor law. Complaint, ¶ 31. It thus seeks a declaration that the VIWDA is unconstitutional. Complaint, ¶ 33. The ad damnum clause asks for an injunction barring enforcement of the statute until appropriate rules and regulations are promulgated and for a declaration that the statute is unconstitutional because it impairs General Offshore's contracts, denies substantive and procedural due process, and effects a taking without due process of law. The clause asks for all appropriate relief, which presumably is both equitable and legal. The parties have since filed motions for summary judgment. This court's jurisdiction rests upon 28 U.S.C.

---

[2] Unsurprisingly, this is contested by General Offshore, which alleges that Martin failed to perform his duties adequately. Complaint, ¶ 9; Affidavit of Larry Shumaker at 6.

§ 1331[3] and 48 U.S.C. § 1612(a).[4]

---

[3] The plaintiff filed this action under 42 U.S.C. §§ 1981, 1983, & 1985, which would require that this court take jurisdiction through 28 U.S.C. § 1343. Neither § 1981 nor § 1985 applies here, though. Section 1981, as the Court has recently noted, prohibits *racial* discrimination in the making and enforcement of contracts. Patterson v. McLean Credit Union, 109 S. Ct. 2363, 2372–73 (1989); see also Jones v. Alfred H. Mayer Co., 392 U.S. 409, 436 (1968). General Offshore does not complain of racial discrimination here, and so § 1981 does not apply. Likewise, § 1985 is directed toward conspiracies to deprive persons of their civil rights because of some class-based racial animus. United Bhd. of Carpenters and Joiners of Am. v. Scott, 463 U.S. 825, 836–39 (1983); Griffin v. Breckinridge, 403 U.S. 88, 102 (1971). Neither racial animus nor conspiracy is properly alleged here; consequently, § 1985 also does not apply.

This would leave § 1983 as a basis for jurisdiction. When the complaint was filed, this was appropriate. However, on April 24, 1990, the Supreme Court ruled that § 1983 applies neither to territories nor to territorial officers acting in their official capacities. Ngiraingas v. Sanchez, 110 S. Ct. 1737 (1990). It is the territorial counterpart to Will v. Michigan Dep't of State Police, 109 S. Ct. 2304 (1989). Will, however, only precludes retrospective and monetary relief; as the Court was careful to observe, "a State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983." 109 S. Ct. at 2311 n.10. Since the claims here are declaratory and injunctive, they would, if brought against state officials, be cognizable under § 1983. Ngiraingas, however, contains no language paralleling footnote ten in Will. Since Ngiraingas presented a request for damages, the equitable question was not before the Court. Although the holding in Will suggests that prospective relief may still be available in § 1983 actions brought against territorial officials, such a statement is wholly inferential.

This point is pertinent because exhaustion of remedies is not required in § 1983 actions, though it otherwise generally is. Patsy v. Board of Regents, 457 U.S. 496 (1982); Moorhead v. Government of the Virgin Islands, 556 F. Supp. 174, 175–76 (D.V.I. 1983). Although this court reads Ngiraingas and Will to allow declaratory and injunctive suits against territorial officials, the novelty of this point leads it to include an exhaustion of remedies section in this opinion, should this reading prove misguided. In any event, this court's jurisdiction to hear these constitutional claims may rest upon the general federal question section, 28 U.S.C. § 1331.

[4] The plaintiff appears to allege jurisdiction based upon 28 U.S.C. § 2201, the Declaratory Judgment Act. Complaint, ¶ 1. This is not correct. First, it is by no means clear that the federal Declaratory Judgment Act applies to the Virgin Islands. The federal statute applies, by its terms, to "any court of the United States." 28 U.S.C. § 2201. The phrase "court of the United States," in turn, is defined to include only courts whose judges hold office during good behavior, which does not include territorial district courts. 28 U.S.C. § 451.

The only evidence that the federal statute might apply comes from Federal Rule of Civil Procedure 57, which states that "[t]he procedure for obtaining a

One threshold matter needs to be addressed. The plaintiff earlier filed a motion for a preliminary injunction, based upon the procedural due process issues. In a later memorandum, the plaintiff stated that the motion had been denied, and that the court had stated that the procedural due process issues should be raised by a writ of review. Memorandum in Support of Motion for Summary Judgment at 2–3. While this court does not question the accuracy of this statement, no order denying the motion was ever entered. Consequently, for the sake of completeness, this court shall briefly consider the motion here.

■■ To secure a preliminary injunction, the moving party must demonstrate:

> (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured pendente lite if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

West Indian Co. v. Government of the Virgin Islands, 812 F.2d 134, 135 (3d Cir. 1987) (per curiam) (quoting Professional Plan Examiners

---

declaratory judgment pursuant to Title 28 U.S.C. § 2201, shall be in accordance with these rules . . ." This, however, does not extend the coverage of the federal statute; it only sets forth a procedure for that statute's use. Moreover, the statute that makes the Federal Rules applicable to the Virgin Islands puts the Rules in place only "[w]here appropriate." 48 U.S.C. § 1614(b). The legislative history of that section makes clear that the exceptions to coverage come for "those provisions . . . relating to judges who are appointed during good behavior." 130 Cong. Rec. 23,790 (1984). Since, as noted above, the federal Declaratory Judgment Act applies only to courts containing such judges, the Federal Rules cannot extend the federal act to the Virgin Islands. Hence, the Virgin Islands Declaratory Judgment Act, V.I. Code Ann. tit. 5, §§ 1261–1272 (1967), not the federal statute, would apply here. See Companion Assurance Co. v. Alliance Assurance Co., 585 F. Supp. 1382, 1384 (D.V.I. 1984). Cf. Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1174 & n.2A (3d Cir. 1976) (not clear which applies; decided before 48 U.S.C. § 1614(b) enacted).

Second, neither the federal nor the Virgin Islands statute creates jurisdiction. Rather, they merely expand the remedies available in cases properly before a court. Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 71 n.15 (1978); Luis v. Dennis, 751 F.2d 604, 607 (3d Cir. 1984); Richardson v. Virgin Islands Hous. Auth., 18 V.I. 351, 355 (D.V.I. 1981); see also V.I. Code Ann. tit. 5, § 1272 (1967) (Virgin Islands statute to be harmonized with federal law). Thus, even if the federal act applied here, it would not support the plaintiff's claim. Since jurisdiction is otherwise adequate, however, this point is not critical.

v. LeFante, 750 F.2d 282, 288 (3d Cir. 1984)). Here the plaintiff, as the discussion below will demonstrate, has not shown a reasonable probability of success, at least on the facial challenges. While the as-applied challenge may prove successful, it necessarily must await administrative resolution. At this point, we simply do not know what regulations will be applied in the Martin hearing, or how they will be promulgated; as a result, a procedural due process challenge would be entirely speculative until the hearing takes place. In addition, in light of the findings below, enjoining the administrative process would significantly impair the public interest, as expressed by the legislature, in an efficient means of resolving wrongful discharge disputes. This court thus renders concrete Chief Judge O'Brien's denial of the motion for a preliminary injunction. This obviates any need to consider the procedural due process issues below, especially insofar as they were not raised in the briefing for the summary judgment motions.[5]

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must construe all facts and inferences in the light most favorable to the non-moving party. Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361–62 (3d Cir. 1987). The evidence so construed, though, the movant will prevail if there are no genuinely disputed issues that could support a verdict for the non-moving party and that would prove essential to the claim. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). The facts stated, except where dispute is noted, are uncontradicted.

---

[5] This court notes that General Offshore has expressed concern about the possible release of confidential information in the hearing before the Commissioner. If the risk is present, General Offshore may request that the record of the hearing be placed under seal, or that any documents filed be placed under a protective order.

This court also notes that Chief Judge O'Brien, in the version of his findings set forth by the plaintiff, expressly observed that the temporary procedural rules complained of by the plaintiff would soon be made formal. This does not yet seem to have taken place. While review of the procedural due process issues must await a writ of review, this court feels obliged to observe that the lack of formal regulations may pose significant due process problems. Great Cruz Bay Dev. Co. v. Virgin Islands Bd. of Land Use Appeals, 18 V.I. 536 (D.V.I. 1981); Harnett v. Board of Zoning, Subdivision and Bldg. Appeals, 350 F. Supp. 1159 (D.V.I. 1972).

■ Before this court can address the merits of the plaintiff's claims, it must consider whether they are justiciable. Even where the defendants do not challenge this court's jurisdiction, this court must do so itself. Regional Rail Reorganization Act Cases, 419 U.S. 102, 138 (1974); Felmeister v. Office of Attorney Ethics, 856 F.2d 529, 535 (3d Cir. 1988). After these threshold issues are resolved, this court will consider the substance of the motions for summary judgment.

## II. JUSTICIABILITY

The defendants argue that the plaintiff's claims are only partly justiciable. Relying upon the distinction between facial and as-applied challenges to the constitutionality of a statute, they maintain that only the facial challenges to the statute are ripe for adjudication. Memorandum of Defendants Regarding Cross-Motions for Summary Judgment at 1–15.[6] The plaintiff argues that the whole dispute is justiciable. Reply of General Offshore Corporation to Defendants' Motion to Dismiss at 19–22. Justiciability has many components, which differ more in emphasis than in content. See, e.g., Solar Turbines, Inc. v. Seif, 879 F.2d 1073, 1080 (3d Cir. 1989) (finality and ripeness substantially overlap); Bethlehem Steel Corp. v. EPA, 669 F.2d 903, 908 & n.3 (3d Cir. 1982) (finality and exhaustion serve same interests). The least specific component is standing, which focuses primarily upon the existence of a cognizable harm. The doctrines that remain generally take the existence of harm for granted, but direct inquiry to other aspects of justiciability. The pertinent doctrines here are ripeness, exhaustion of administrative remedies, and finality, which will be discussed after standing.

A. *Standing*

■■ Standing has both Article III and prudential components. Warth v. Seldin, 422 U.S. 490, 498 (1975). Article III requires that a suit present a "case or controversy." Without this, a court has no power to entertain a suit; the federal courts are not empowered to issue advisory opinions. Muskrat v. United States, 219 U.S. 346, 361 (1911); Hayburn's Case, 2 U.S. (2 Dall.) 409, 410 n.(a) (1792). This is

---

[6] The defendants originally asserted that the plaintiff's claims were all unripe. Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss at 4–8. This court assumes that this position has been abandoned, in light of the more recent memorandum cited in the text.

also true for a declaratory judgment action. Although, by definition, declaratory judgments are sought in advance of the full harm expected, they must still not present "abstract, hypothetical or contingent questions." Alabama State Fed'n of Labor v. McAdory, 325 U.S. 450, 461 (1945) (Stone, C.J.). Article III thus requires the party seeking relief to show that it "has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979); see also Whitmore v. Arkansas, 110 S. Ct. 1717, 1723 (1990); Linda R.S. v. Richard D., 410 U.S. 614, 617 (1973). The party must thus have "alleged such a personal stake in the outcome of the controversy" as to warrant a federal court's exercise of its limited jurisdiction. Baker v. Carr, 369 U.S. 186, 204 (1962). In addition, the injury complained of must be "fairly traceable to the defendant's allegedly unlawful conduct." Allen v. Wright, 468 U.S. 737, 751 (1984); Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982). Finally, the injury must be "likely to be redressed by a favorable decision." Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38 (1976); see also Whitmore, 110 S. Ct. at 1723; Allen, 468 U.S. at 751.

These requirements are met here. If the VIWDA is constitutional, it would raise General Offshore's costs of doing business by restricting its ability to release employees and subjecting it to increased administrative expenses stemming from the hearing and judicial review clauses for those it does release if enforcement were likely. The Court has made clear that there is no case or controversy if a complained-of statute or regulation is not likely to be applied against the complainant. See, e.g., O'Shea v. Littleton, 414 U.S. 488, 494–96 (1974); Poe v. Ullman, 367 U.S. 497, 508 (1961); see also Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1170 (3d Cir. 1987); Luis v. Dennis, 751 F.2d 604, 607–08 (3d Cir. 1984). However, a threat of enforcement, even one "implicit in the attitude of the defendant," is enough. Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp., 257 F.2d 485, 490 (3d Cir. 1958) (Maris, J.); see also Vance v. Universal Amusement Co., 445 U.S. 308 (1980) (per curiam) (threatened to secure injunction enforcing nuisance statute; held justiciable); Public Utils. Comm'n v. United States, 355 U.S. 534, 537–38 (1958) (sought enforcement of rate statute; held justiciable); Railway Mail Ass'n v. Corsi, 326 U.S. 88, 93 (1945) (appeal from state declaratory judgment applying state statute to petitioner held justiciable). As

the Court has phrased it, the plaintiff must demonstrate "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979); see also Whitmore, 110 S. Ct. at 1724–25; Regional Rail Reorganization Cases, 419 U.S. at 143 ("'One does not have to await the consummation of threatened injury to obtain preventive relief.'" (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593 (1923)). Here, the statute has already been enforced against General Offshore. The record also reflects a steady series of complaints filed with the Commissioner since the VIWDA was enacted. Defendants' Opposition to Plaintiff's Application for Preliminary Injunction at 4. Because there is a very real threat of enforcement, the case or controversy requirement of an injury in fact has been met.

■ The remaining elements pose no difficulties. The injury is direct; with no statute, there would be no injury. Finally, a declaration that the statute is unconstitutional, or an injunction prohibiting its use, would eliminate the alleged burden. This court thus has no difficulty in finding that the Article III requirements of standing have been met. See, e.g., Franchise Tax Bd. v. Alcan Aluminium Ltd., 110 S. Ct. 661, 664–65 (1990) (standing to challenge franchise tax upheld).

The defendants do not challenge this element of justiciability.[7] Rather, they argue that the prudential requirements have not been met here for the claims that seek to void this statute as it is applied. Although the plaintiff addressed only the Article III component of

---

[7] In their response to General Offshore's application for a preliminary injunction, the defendants argued that, because General Offshore had not filed its annual report and financial statement with the Office of the Lieutenant Governor, it would be barred from bringing suit. Defendants' Opposition to Plaintiff's Application for Preliminary Injunction at 2 & Exh. B. This misconstrues local law. By statute, a foreign corporation may not sue in the courts of the Virgin Islands if it has not registered with the Office of the Lieutenant Governor; however, the defendants' own affidavit establishes that General Offshore has registered properly. V.I. Code Ann. tit. 11, § 1212 (1982); Defendants' Opposition at Exh. B. Failure to pay franchise taxes may similarly bar suit, but the same affidavit establishes that General Offshore has paid its taxes. V.I. Code Ann. tit. 13, § 533(a) (1982); Defendants' Opposition at Exh. B. In contrast, the statutory penalties for failing to file an annual report, though substantial, do not include barring the offender from court. V.I. Code Ann. tit. 13, § 374 (1982). The objection is thus misplaced. In passing, this court notes that a statute conditioning a foreign firm's access to the courts on payment of a fee or on registration would appear to pose serious due process and equal protection problems. See, e.g., Boddie v. Connecticut, 401 U.S. 371 (1971).

standing in its briefs, this court will assume that this deficiency was not motivated by a desire to concede the issue, but, rather, by a misplaced overemphasis on the Article III aspects of this problem. Accordingly, the prudential questions require some discussion.

■ The prudential factors are in place in part to insure that the courts not resolve issues better left to other governmental institutions or to the electorate. Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 222 (1974). Although the Constitution may not require courts to defer, principles of sound judicial administration and the proper role of the judiciary inform this area. The courts are sufficiently burdened with active disputes without reaching out to address inchoate or moot matters. Prudential considerations are especially important when a court is asked to render a constitutional opinion; while a court's reading of a statute may be overturned by the legislature with relative ease, its reading of the Constitution may be altered only by the immensely difficult process of constitutional amendment, or, here, amendment to the Organic Act. The Court has thus developed a series of principles employed to avoid constitutional decision-making. Ashwander v. TVA, 297 U.S. 288, 345–48 (1936) (Brandeis, J., concurring).

■ The prudential concerns unique to standing doctrine do not bar adjudication here. Thus, for example, the vigor with which this case has been litigated amply demonstrates that it is not collusive. See, e.g., Moore v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 47, 48 (1971) (per curiam); Lord v. Veazie, 49 U.S. (8 How.) 251, 255 (1850). Likewise, there is no worry here that the plaintiff seeks to evoke the rights of another, so the thorny problems of constitutional jus tertii are irrelevant.

■ There remains, however, one important obstacle to adjudication: the complaint before the Commissioner is unresolved. A court seeking to avoid constitutional decision-making might thus defer action until the Commissioner has acted, on the chance that a ruling for General Offshore might moot the dispute. Defendants' Opposition to Plaintiff's Application for Preliminary Injunction at 4 (70% of rulings for employer). This is a legitimate element of the prudential aspect of justiciability. CEC Energy Co. v. Public Serv. Comm'n, 891 F.2d 1107, 1109 (3d Cir. 1989). While this can be treated as an aspect of standing doctrine, its stress on the temporal attributes of adjudication suits it best to discussion under ripeness, exhaustion of remedies, and finality.

## B. *Ripeness*

As Professor Davis has put it, "[t]he basic purpose of ripeness law is . . . to conserve judicial machinery for problems which are real and present or imminent, not to squander it on abstract or hypothetical or remote problems." 4 K. Davis, Administrative Law Treatise § 25:1 (1982). In this, it follows closely the purpose for standing doctrine. Ripeness, however, looks at whether the dispute is ready for adjudication, not whether it is genuine (a prerequisite to ripeness). The doctrine thus prevents "the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way." Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1967); see also CEC Energy, 891 F.2d at 1109.

The courts have laid down general principles for resolving ripeness problems, though the determinations are necessarily made case by case. As Abbott Laboratories, the leading ripeness case, instructs us, a court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories, 387 U.S. at 149; see also Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n, 461 U.S. 190, 201 (1983). The first point invokes a number of related factors. Where a decision would require extensive factual findings of the sort normally made by an agency in the course of its deliberations, the courts have held the dispute unripe. See, e.g., Pennell v. City of San Jose, 485 U.S. 1, 9–10 (1988) (takings claim unripe where agency had not yet supplied factual predicate); Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 199–200 (1985) (same); Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 165–66 (1967) (challenge to FDA regulations unripe where administrative hearing would set forth basis for regulations, supply factual basis of order); Wilmac Corp. v. Bowen, 811 F.2d 809, 812 (3d Cir. 1987) (challenge to Medicaid regulation unripe where controversy rested upon factual issues). In contrast, purely legal or constitutional issues are generally fit for adjudication. See, e.g., 485 U.S. at 11–14 (due process and equal protection issue ripe); Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 81–82 (1978); Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 171 (1967); Abbott Laboratories, 387 U.S. at 149; Exxon Corp. v. FTC, 588 F.2d 895, 903 (3d Cir. 1978); L. Tribe, Constitutional Law § 3-10, at 80 (2d ed. 1988). These issues

241

are even suitable for adjudication when the factual findings "would be useful," but are not necessary. Pacific Gas & Elec., 461 U.S. at 201.

■ The second point—whether the parties would suffer hardship if the court stayed its hand—also contains several interrelated elements. It must be clear that the plaintiff is in fact injured by the actions of which he complains, or, at least, that injury is threatened. See, e.g., Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 507 (1972) (constitutional challenge to statute ripe when compliance costly); Evers v. Dwyer, 358 U.S. 202, 204 (1958) (per curiam) (threatened enforcement of statute enough to allow challenge). Cf. Roe v. Wade, 410 U.S. 113, 126–27 (1973) (no declaratory relief available for physician whose rights are not immediately threatened by state statute). Moreover, the harm complained of must be "immediate and significant." Abbott Laboratories, 387 U.S. at 153; see also, e.g., Felmeister, 856 F.2d at 537; Wilmac, 811 F.2d at 813; L. Tribe, § 3-10, at 82. If the plaintiff alleges adequate harm, though, the claims are ripe if delay would injure the parties. If, for example, the challenged statute or regulation is not enforced vigorously because its constitutionality is in question, prompt resolution would benefit both parties. Abbott Laboratories, 387 U.S. at 154.

The issues in this case are, by these standards, partially ripe for judicial resolution. The ripe aspect of this case is the facial challenge to the in VIWDA's constitutionality. By definition, a facial challenge is made in a factual vacuum; the court's job is merely to determine whether the statute, however applied, is constitutional. Consequently, the issues presented in a facial challenge are purely legal, making whatever factual determinations the Commissioner could supply irrelevant. See, e.g., Times Film Corp. v. City of Chicago, 365 U.S. 43, 46 (1961). Moreover, the Commissioner could at best rule on whether Martin was wrongfully discharged and what back pay he would be owed. These areas are not germane to a constitutional challenge based upon a *general* impairment of employment contracts, as is the case here. Accordingly, the facial challenges meet the first part of the Abbott Laboratories test.

■ The second part is also met. The harm complained of is not insubstantial. In economic terms, it amounts to the value of the plaintiff's loss of the ability to discharge its employees essentially at

will.[8] Besides the expense of the administrative proceedings, the plaintiff is exposed to potential liability for back pay awards and, in judicial proceedings, punitive damages. This court must add to these the chilling effect upon firing that this statute could engender. While the actual value of these is not before the court, and while determining it would be very difficult, this court concludes that, for the purposes of deciding whether the facial challenges are ripe, the harm is significant. The expense is also immediate, as the VIWDA has exerted its economic effect from its enactment. Finally, it is clear that a prompt decision would benefit both parties. If the VIWDA is facially unconstitutional, the plaintiff, and all other employers in the Virgin Islands, will not have to go through further proceedings. They will be able to make personnel decisions that they were hitherto reluctant to effect. If the VIWDA is facially constitutional, on the other hand, the employers can make permanent whatever temporary adjustments they may already have made. The Commissioner can also resolve all pending complaints without the uncertainty that now besets his actions. He, too, can make permanent the regulatory mechanism (for example, by promulgating formally the regulations that govern the administrative hearings). Finally, this court takes judicial notice of the cases raising similar issues that lay heavy upon its docket.[9] All parties in those cases would be well-served if this court ruled on the facial constitutional challenge before it, thus obviating the need for the other facial challenges. Therefore, this court concludes that the facial challenges to the constitutionality of the VIWDA are ripe for adjudication.

The as-applied challenges, however, are not ripe. Though it is true that the constitutional issues in question are not within the capacity

---

[8] It is true that this court has created a public policy exception to the at-will employment doctrine. Moore v. A.H. Riise Gift Shops, 659 F. Supp. 1417 (D.V.I. 1987); Robinson v. Hess Oil Virgin Islands Corp., 19 V.I. 106 (D.V.I. 1982). However, this exception is narrower than that in the statute.

[9] This court is aware that justiciability determinations are generally made on the basis of the facts extant at the time the complaint was filed. See, e.g., Dennis, 751 F.2d at 608. However, as the Supreme Court has observed, a delay in adjudication may make a claim ripe. Buckley v. Valeo, 424 U.S. 1, 116–117 (1976) (per curiam). Here, the judicial shortage in the Virgin Islands, exacerbated by Hurricane Hugo, has brought about regrettable delay with the civil docket. The motions resolved in this case have been pending for a year and a half. Thus, following Buckley, this court finds that it can examine its own docket as part of a narrow exception to the rule above. In any event, this court notes that its resolution of the ripeness issue does not depend upon this finding.

of the Commissioner to resolve, the Commissioner can decide whether the specific discharge to which the statute would, the plaintiff argues, be unconstitutionally applied, was wrongful, and can set the back pay award. These facts are critical to the constitutional challenge; if there was no wrongful discharge, then the as-applied challenge is moot. CEC Energy Co., 891 F.2d at 1109. In addition, the specific grounds raised by the plaintiff require some factual development. The takings and impairment arguments require that the extent of the deprivation of property or the impairment of contract be determined. See, e.g., Williamson County Regional Planning Comm'n, 473 U.S. at 199–200. Finally, the procedural due process claims rely of necessity upon the process actually afforded the plaintiff; consequently, they must await administrative resolution.

The second prong of the Abbott Laboratories test dictates the same conclusion. The likelihood of mootness undergirds this finding; since the Commissioner may well rule for the plaintiff, the plaintiff would not be unduly burdened by delay. Deciding an as-applied challenge would also not grant any great benefit to either party, because the facial validity of the statute could still be in question. In addition, the value of this single case is sufficiently low that a delay in judicial resolution will not cause substantial harm to either party. Given the strong policy of Ashwander and its progeny in favor of avoiding constitutional issues, and given the legislature's strong interest in administrative resolution of wrongful discharge claims, it would be inappropriate for this court to hear the as-applied challenge before the Commissioner has addressed the underlying dispute.

This dichotomy between facial and as-applied challenges is borne out by the caselaw. An early case to this effect is Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926). There the Court found that a pre-enforcement due process, equal protection, and takings challenge to a zoning ordinance was justiciable, even in the absence of any record of actual or threatened enforcement. In so holding, the Court said that:

> the attack is directed, not against any specific provision or provisions, but against the ordinance as an entirety. Assuming the premises, the existence and maintenance of the ordinance, in effect, constitutes a present invasion of appellee's property rights and a threat to continue it. Under these circumstances, the equitable jurisdiction is clear.

272 U.S. at 386. The Court specifically noted that the ordinance as applied might still be unconstitutional; that question, however, was not properly before the Court. 272 U.S. at 395.

 More recently, the Court explicitly drew the facial/as-applied distinction when deciding whether disputes were justiciable. In Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264 (1981), the plaintiff brought a pre-enforcement challenge to the constitutionality of the Surface Mining Control and Reclamation Act, alleging that it effected a taking. The Court held that the takings claim was justiciable insofar as it presented a facial attack upon the statute. 452 U.S. at 295. However, an as-applied challenge would have to await the factual findings that would be made an administrative hearing; in addition, the challenge might be mooted by the administrative proceedings. 452 U.S. at 294–95, 297. In a companion case, Hodel v. Indiana, 452 U.S. 314 (1981), the challenges were rooted in the Equal Protection Clause, the Due Process Clause, and the Commerce Clause. Here, too, the Court held that the facial challenges were ripe. 452 U.S. at 330–31. However, because the statutory penalties had not yet been imposed, the challenges to them would have to await their application. 452 U.S. at 335–36. The Hodel cases, like the Ambler case, thus squarely support a distinction between facial and as-applied constitutional challenges for ripeness determinations. Therefore, for the reasons stated above, this court finds that the facial challenges are ripe for adjudication, but that the as-applied challenges are not, and will not be until the Commissioner has ruled on the underlying wrongful discharge action.

C. *Exhaustion of Remedies*

 Exhaustion of remedies doctrine, a more focused version of ripeness doctrine, concentrates on whether the complainant has availed itself of all the administrative remedies that the statute affords. As our Court of Appeals has observed, this rule rests upon three policy concerns. First, it shows deference to the legislative determination that an administrative tribunal should hear a dispute initially. Second, it respects administrative autonomy by preventing the courts from impairing administrative functions. Third, it fosters judicial economy by allowing an administrative tribunal to render the dispute moot, and by supplying a factual predicate for any future judicial proceedings. Republic Indus., Inc. v. Central Pa. Teamsters Pension Fund, 693 F.2d 290, 293 (3d Cir. 1982) (Aldisert, J.); see also,

245

e.g., McKart v. United States, 395 U.S. 185, 193–95 (1969); LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Management Comm'n, 866 F.2d 616, 620 (3d Cir. 1989); Facchiano v. United States Dep't of Labor, 859 F.2d 1163, 1166–67 (3d Cir. 1988).

An extreme version of the rule appears in an early Supreme Court opinion: "[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51 (1938). This statement has, however, been qualified greatly by subsequent opinions. For example, in Weinberger v. Salfi, 422 U.S. 749 (1975), the Court held that exhaustion would not be required when the only issue raised was the constitutionality of the statute; since the agency was not authorized to address the constitutional issue, there would be no loss of deference to an administrative body were a court to resolve it. 422 U.S. at 765–66; see also Public Utilities Comm'n v. United States, 355 U.S. 534, 539–40 (1958) (where only question is validity of administrative procedure, judicial relief available without exhaustion). The Court of Appeals has laid out three exceptions to the Myers rule, saying that:

> We have declined to require exhaustion [1] when the challenged agency action presents a clear and unambiguous violation of statutory or constitutional rights, [2] when resort to administrative procedures is "clearly shown to be inadequate to prevent irreparable injury," or [3] when exhaustion is "futile."

Facchiano, 859 F.2d at 1167–68 (quoting Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, 619 F.2d 231, 245 (3d Cir. 1980)); see also, e.g., LaVallee Northside Civic Ass'n, 866 F.2d at 620–21; Flying Tiger Line v. Teamsters Pension Trust Fund, 830 F.2d 1241, 1252–53 (3d Cir. 1987); Republic Indus., 693 F.2d at 293; Bethlehem Steel Corp. v. EPA, 669 F.2d 903, 907–10 (3d Cir. 1982). Whether to command that remedies be exhausted is ultimately a matter for "sound judicial discretion." Cerro Metal Prods. v. Marshall, 620 F.2d 964, 970 (3d Cir. 1980); see also Flavo-Rich v. Quinn, 18 V.I. 530, 533 (D.V.I. 1981).

As with the ripeness section above, this question is best addressed by looking at the facial and as-applied challenges separately. The facial challenges fall within the exceptions to the exhaustion rule of Myers. As in Salfi, the sole questions raised here are constitutional; allowing the agency to hear the claims will thus not resolve the questions raised here, and a judicial hearing will not infringe upon the

domain of the Commissioner. Cf. Macauley v. Waterman S.S. Corp., 327 U.S. 540, 544 (1946) (where administrative agency empowered to determine whether contract within statutory purview, exhaustion required before court may make that determination); Cost Control Mktg. and Management, Inc. v. Pierce, 848 F.2d 47, 49 (3d Cir. 1988) (per curiam) (declaration sought that plaintiff not within scope of statute; since agency could make that finding, no relief granted). Furthermore, the facial challenges are premised upon the assertion, difficult to deny, that the statute diminishes somewhat the value of all labor contracts entered into before it was enacted. They hence do not depend upon the outcome of any particular discharge; rather, they depend upon the impairment of General Offshore's ability to discharge its employees and upon the generally lowered worth of its labor contracts. The legislature has not delegated this sort of dispute to the Commissioner to resolve, so the separation of powers would not be breached were the only body competent to decide it—this court—did so.

 In addition, the facial dispute would not be made easier to resolve were Mr. Martin's discharge to be adjudicated by the Commissioner. The administrative record would not address the larger questions, such as the extent to which all contracts were impaired or their value taken, which the facial challenge presents. All the Commissioner can do is decide whether General Offshore was justified in discharging Mr. Martin and, if not, determine how much back pay Mr. Martin is owed. These questions are not unimportant, but they are irrelevant to the facial challenge. Finally, there is no chance that administrative adjudication might moot the facial challenge. All that it could do is moot the Martin dispute. Insofar as all other contracts are impaired, the Commissioner's actions are irrelevant. Since the record reflects that the Commissioner does not always rule for the employer, there would remain a real threat of enforcement sufficient to overcome the justiciability threshold. Defendants' Opposition to Plaintiff's Application for Preliminary Injunction at 4. Consequently, the reasons behind the exhaustion doctrine are not served by deferring resolution of the facial challenge. Within the Court of Appeals' rubric, requiring administrative exhaustion before hearing the facial challenges would subject the plaintiff to a futile process, because the administrative procedures afforded the plaintiff could not grant the plaintiff the relief sought. See, e.g., Weinberger v. Wiesenfeld, 420 U.S. 636, 641 n.8 (1975) (no exhaustion required

where plaintiff challenges statute that on its face bars relief); Hillsborough Township v. Cromwell, 326 U.S. 620, 625 (1946) (no exhaustion required where remedy inadequate).

■ The as-applied challenge presents quite another question. Because that focuses upon the discharge of one particular employee, a ruling for General Offshore could moot the dispute. Moreover, though the Commissioner cannot resolve the constitutional issues that the as-applied challenge presents, he can make them more concrete. The plaintiff can only complain of the manner in which the Commissioner has applied the statute and regulations after they have been applied. Thus, for example, a procedural due process claim can arise when a facially valid set of regulations is applied unfairly. Hence, the as-applied challenges must await administrative adjudication before this court may rule on them, should the dispute not have been rendered moot in the meantime.

D. *Finality*

■ Finality doctrine focuses upon whether the administrative action complained of is final; if not, judicial resolution must await final agency action, in order that the record may be made clearer, the agency may have the opportunity to refine its actual position without judicial disruption, and the agency may create an actual case or controversy by inflicting an actual injury. Williamson County Regional Planning Comm'n, 473 U.S. at 193; Bethlehem Steel, 669 F.2d at 908–09. Thus, the Court has held that a complaint filed by an agency is not final agency action. FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 246 (1980); see also Solar Turbines, 879 F.2d at 1077, 1081 (notice of violation not final agency action). However, an agency's regulations are final agency actions. Abbott Laboratories, 387 U.S. at 149. Put generally, this court must consider "whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970). These determinations must be made "in a pragmatic way." Abbott Laboratories, 387 U.S. at 149.

The facial/as-applied dichotomy is hence relevant here, for much the same reasons as for ripeness and exhaustion. For the facial challenge, the complaint focuses on the unconstitutionality of the statute

per se, and so the final necessary act is the enactment of the statute.[10] Whether the administrative hearing has taken place is hence not relevant, as such legal consequences as there are flow entirely from the existence of the statute. The test above is thus largely beside the point; judicial review would not disrupt orderly adjudication, because it proceeds indifferent to whether administrative adjudication exists in this or in any other case. However, the as-applied challenge depends upon just what the Commissioner does in the course of the administrative hearing. The Standard Oil case above precludes this court's review on the basis of the bare existence of a complaint; even if that case had not been decided, though, the basic principles of finality law demonstrate that a court may not hear a challenge to an agency's actions until the actions complained of are final. See, e.g., Virgin Islands Conservation Soc'y, Inc. v. Virgin Islands Bd. of Land Use Appeals, 881 F.2d 28, 32 (3d Cir. 1989) (petitions for rehearing render agency actions non-final); Director, Office of Workers' Compensation Programs v. Brodka, 643 F.2d 159, 161 (3d Cir. 1981) (remand for determination of attorney's fees removes finality). Here the Commissioner has *not* determined General Offshore's rights or obligations; it is thus difficult to speak of a final agency action. Consequently, the as-applied challenges would, at this stage, attack non-final proceedings. The plaintiff must therefore await finality. The result, given the disposition of the procedural due process claims, is thus the same as for ripeness and exhaustion of remedies: the facial challenges may be heard, but the as-applied challenges must await administrative resolution.

 This court shall thus dismiss the as-applied challenges for want of jurisdiction. They, along with the procedural due process

---

[10] The exception would be the procedural due process claim, which attacks the regulations as well. To the extent that the challenge rests upon a decision by the Government of the Virgin Islands not to promulgate the regulations, there would be adequate finality; the decision not to promulgate regulations would already be final, and hence challengeable. However, since the regulations in question are only read into the record at the start of each proceeding, the content of the regulations could only be challenged at the time of the administrative hearing. Furthermore, the regulations may yet be enacted properly. Hence, the hearing before the Commissioner must take place before this court can rule on whether the regulations themselves violate General Offshore's constitutional rights. Since the procedural due process issues were raised only in the preliminary injunction motion, though, which has been resolved, they need not be addressed further here.

challenge, may, if appropriate, be heard on a writ of review. This court shall now turn to the facial challenges to the VIWDA.

## III. FACIAL CHALLENGES

### A. *Substantive Due Process*

In the first of the facial attacks, the plaintiff maintains that the VIWDA violates its rights to substantive due process, as protected by the Due Process Clause of the Virgin Islands Organic Act, 48 U.S.C. § 1561,[11] by impairing its rights to contract freely.[12] This argument is unavailing.

The modern scope of the right to economic substantive due process is very limited. Courts begin with the principle that, as our Court of Appeals has put it, "the process of democratic political decision-making often entails the accommodation of competing interests, and thus necessarily produces laws that burden some groups and not others." Rogin v. Bensalem Township, 616 F.2d 680, 687 (3d Cir. 1980) (Adams, J.); see also, e.g., Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 424 (1952). It is presumed that legislatures will have ample scope within which to advance the public good, and hence that courts will not look too closely upon legislative attempts to do so. See, e.g., Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976); Ferguson v. Skrupa, 372 U.S. 726, 730 (1963); Day-Brite Lighting, 342 U.S. at 423; In re Ashe, 669 F.2d 105, 111 (3d Cir.), vacated on other grounds, 459 U.S. 1082 (1982). No longer is it appropriate for a court to evaluate the wisdom of a statute by its own lights; rather, it is for the legislature, using whatever standards it chooses to adopt, to find a proposed statute wise or unwise. Exxon Corp. v. Governor of Md., 437 U.S. 117, 124–25 (1978); In re Ashe, 669 F.2d at 111. As Justice Douglas phrased it, "[t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." Williamson v. Lee Optical, 348 U.S. 483, 488 (1955).

---

[11] As before, this court will use cases construing the parallel sections of the United States Constitution as authority.

[12] Since this is a facial challenge, it is necessary for the plaintiff to establish that the statute is incapable of any valid construction in order to prevail. Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n.5 (1982).

■ The courts have thus fashioned an extremely relaxed test by which economic regulations are tested for substantive due process violations. For a regulation to be upheld, it need only be rationally related to a legitimate state purpose. Exxon Corp., 437 U.S. at 124–25; United States v. Carolene Prods. Co., 304 U.S. 144, 152 (1938); Empire Kosher Poultry, Inc. v. Hallowell, 816 F.2d 907, 912 (3d Cir. 1987); Rushton Mining Co. v. Morton, 520 F.2d 716, 721 (3d Cir. 1975). Moreover, the challenger must establish that the legislature could have had no rational basis, or that the legislation was wholly unrelated to any legitimate state goal. Turner Elkhorn Mining Co., 428 U.S. at 15; Bello v. Walker, 840 F.2d 1124, 1129 (3d Cir. 1988); Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d 1023, 1035 (3d Cir. 1987). It is not enough to show that the legislation is unlikely to promote the announced end, or that it is otherwise imprudent; as noted, above, "it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." Ferguson, 372 U.S. at 729. Unless the challenger shows that the challenged regulation is a wholly arbitrary abuse of governmental power, the regulation must stand. Harrah Indep. School Dist. v. Martin, 440 U.S. 194, 198 (1979) (per curiam); Bello, 840 F.2d at 1129.

The plaintiff has failed to meet this daunting standard. The object of this legislation—regulating the conditions of the workplace—is well within the "broad and inclusive concept" of public welfare that a legislature may act to advance. Day-Brite Lighting, 342 U.S. at 424; see also, e.g., Lincoln Fed'l Labor Union v. Northwestern Iron & Metal Co., 335 U.S. 525, 536 (1949) (working conditions regulable). Indeed, statutes that regulated wages and hours were held constitutional even at the high-water-mark of substantive due process protection for business. See, e.g., Muller v. Oregon, 208 U.S. 412 (1908). Were it otherwise, the National Labor Relations Act, among others, could hardly be constitutional. NLRB v. Jones & Laughlin Steel Co., 301 U.S. 1 (1937).

The purpose of the VIWDA is inherent in the legislation, and the legislative history appended to the defendants' memorandum in support of its cross-motion for summary judgment supports this obvious inference. For example, some legislators were concerned about employment discrimination against native Virgin Islanders. Defendants' Memorandum Regarding Cross-Motions for Summary Judgment Exh. A at 11–12, 13–14 (statement of Sen. O'Bryan); id. at 19–20 (statement of Sen. Redfield). Others supported the VIWDA

251

because of more general concerns about unreasoned discharge. Id. at 14 (statement of Sen. Bell). Yet other senators expressed dismay that, under then-current law, an employer could fire its employees for socializing with patrons after work hours. Id. at 6, 8[13] (statement of Sen. Bryan); id. at 18 (statement of Sen. Bell). These concerns are all within the broad and inclusive powers of the legislature. This portion of the substantive due process analysis hence does not aid the plaintiff.

Neither is this legislation demonstrably irrational, given these interests. Once the legitimacy of protecting employees from wrongful discharge is accepted, this statute is necessarily a rational attempt to address the legislative concern. It sets forth a long list of reasons for which discharge is acceptable, and proscribes all others, barring a showing of economic hardship, unprotected concerted activity, or business closure. V.I. Code Ann. tit. 24, § 76 (Supp. 1989). Furthermore, it creates a two-tiered system of administrative and judicial remedies. V.I. Code Ann. tit. 24, §§ 77–78 (Supp. 1989). Though it may not be the ideal system in all respects, and though General Offshore may argue that it is insufficiently solicitous of the welfare of an employer, the scheme seeks to advance its object in a manner that cannot be said to lack all vestiges of rationality. Here, too, General Offshore loses.

◼◼ Ultimately, General Offshore's arguments about impairment of contract and substantial harm done to business expectations, even if true, are simply beside the point under this type of analysis. As the Court put it, "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." Turner Elkhorn Mining, 428 U.S. at 16. Such arguments are more appropriate for Takings Clause or Contracts Clause challenges, which are discussed below. Here, they can only be construed as invitations to re-enter the age of Lochner and its progeny—an invitation that this court cannot, and will not, accept.[14] The facial challenge under substantive due process is denied.

---

[13] There appears to be no page seven.

[14] Judge Posner's statement in a similar matter that "[t]he plaintiffs have brought their case in the wrong era" is not an unfair description of this claim. Chicago Bd. of Realtors, Inc. v. City of Chicago, 819 F.2d 732, 745 (7th Cir. 1987) (opinion of Posner, J., and Easterbrook, J.).

## B. *Equal Protection*

General Offshore maintains that the VIWDA violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as applied to the Virgin Islands by the Organic Act. The statute does so, it is argued, because it places impermissible burdens upon the class of employers, as opposed to the class of employees. Like the substantive due process claim, this one must fail.

The basic requirement of an Equal Protection Clause claim is that there be governmental action creating a classification that burdens one class and benefits another. Sturm v. Clark, 835 F.2d 1009, 1016 (3d Cir. 1987). Of this there is little doubt. The VIWDA plainly benefits workers, by expanding both the scope of their remedies for wrongful discharge and the circumstances under which those remedies are available. In doing so, it necessarily abridges somewhat the ability of employers to discharge workers. General Offshore's claim thus passes this threshold requirement.

To show the existence of a classification is, however, only the start of equal protection analysis. It is clear that the Equal Protection Clause does not require that the state treat all persons alike. Tigner v. Texas, 310 U.S. 141, 147 (1940). Social and economic legislation almost by definition grants benefits to some, but not all, of those governed by it. Philadelphia Police and Fire Ass'n v. City of Philadelphia, 874 F.2d 156, 162 (3d Cir. 1989). Just as with substantive due process analysis, "the courts are not empowered to second-guess the wisdom of state policies. Our review is confined to the legitimacy of the purpose." Western and S. Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 670 (1981). At the same time, the courts must be sensitive to the possibility that a group inadequately represented in the legislative process and traditionally without the means to have its views considered may be the target of legislation for which the normal workings of the democratic process afford no remedy. City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam); United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938).

The courts thus use a three-tier analysis when considering the validity of a statute. Which tier is used depends upon the nature of the classification. The strictest scrutiny is directed toward classifications based on race. See, e.g., City of Richmond v. J.A. Croson Co., 109 S. Ct. 706, 720–21 (1989). Classifications based on gender or legitimacy merit intermediate scrutiny. See, e.g., Craig v. Boren, 429

U.S. 190, 197–99 (1976). Legislation not employing these suspect criteria is subject to the most lenient of these forms of analysis. See, e.g., Pennell v. City of San Jose, 485 U.S. 1, 14 (1988); Hodel v. Indiana, 452 U.S. 314, 331 (1981); Anderson v. City of Philadelphia, 845 F.2d 1216, 1222 (3d Cir. 1988). The parties agree that this last form of analysis applies here; even if they did not, though, it self-evidently does.

■■■ Under this last type of review, the legislative classification will be upheld if it is rationally rated to a legitimate state interest. Pennell, 485 U.S. at 14; Exxon Corp. v. Eagerton, 462 U.S. 176, 196 (1983); Philadelphia Police and Fire Ass'n, 874 F.2d at 163; Lindquist v. Xerox Corp., 571 F. Supp. 470, 471 (D.V.I. 1983). The statute will be upheld if "the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose." Exxon, 462 U.S. at 196; see also Vance v. Bradley, 440 U.S. 93, 111 (1979). Indeed, the reasons relied upon by the court need not be those actually relied upon by the legislators or proffered by them post hoc; as long as the court can construct plausible reasons in support of the state action, the action passes muster. Western and S. Life Ins. Co., 462 U.S. at 196; McGowan v. Maryland, 366 U.S. 420, 425–26 (1961); Anderson, 845 F.2d at 1223. The plaintiff bears the burden of establishing that there are no reasonable grounds for upholding the classification. Kadrmas v. Dickinson Pub. Schools, 487 U.S. 450, 463 (1988); Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464 (1981); Philadelphia Police and Fire Ass'n, 874 F.2d at 163.

■■■ This standard is virtually the same as that for a substantive due process challenge to social or economic regulation. Rogin, 616 F.2d at 689. Unsurprisingly, then, the analysis yields the same result. Without repeating the findings above, which this court incorporates here, the legislature's purposes were legitimate and the means by which they were reached were not clearly irrational or arbitrary. Hodel, 452 U.S. at 331–32. The plaintiff's strenuous attempts to persuade this court that the VIWDA is pointless, or needlessly redistributive, or potentially harmful to employers, are thus at best irrelevancies. Since West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937), these types of arguments have been restricted to the legislative halls. The facial challenge on equal protection grounds must thus be denied; accordingly, summary judgment is granted for the defendants on this issue.

## C. *Contracts Clause*

Here the plaintiff maintains that the VIWDA, by restricting its ability to discharge employees, impaired contracts that existed at the time of its passage and thus violated the Contracts Clause of the United States Constitution, U.S. Const. art I., § 10, as applied to the Virgin Islands in the Revised Organic Act.[15] At the outset, this court observes that a Contracts Clause challenge, like the Takings Clause challenge discussed below, subjects a statute to more searching scrutiny than do the more amorphous equal protection and due process arguments dealt with above. Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 733 (1984); Lincoln Fed'l Labor Union, 335 U.S. at 536. The result here, however, is the same: the VIWDA does not violate the Contracts Clause, and thus the facial challenge must be resolved in favor of the defendants.

The resolute language of the Contracts Clause has been qualified greatly by the courts. As the Court has put it, "[a]lthough the language of the Contracts Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of the people.'" Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410 (1983) (quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434 (1934)); see also Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 502 (1987); Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978). This police power, as suggested above, is substantial indeed; in one oft-cited formulation, the Court stated that it "is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals." Manigault v. Springs, 199 U.S. 473, 480 (1905). Were the Contracts Clause absolute, private parties could immunize themselves against future legislative action merely by entering into long-term contracts. In Justice Holmes' words, "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." Hudson County Water Co. v. McCarter, 209 U.S. 349, 357 (1908); see also

---

[15] This reads: "No law impairing the obligation of contracts shall be enacted." 48 U.S.C. § 1561. Compare U.S. Const. art. I, § 10 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts. . . .").

Exxon Corp. v. Eagerton, 462 U.S. 176, 190 (1983); New York Cent. R.R. Co. v. White, 243 U.S. 188, 198 (1917).

Consequently, the courts have fashioned a test whereby the police power of the state may be reconciled with the proscription against impairing contracts. It thus becomes possible for a statute to work a substantial, or, indeed, total impairment of certain contracts without violating the Contracts Clause. Exxon Corp., 462 U.S. at 190. Under this test, the threshold inquiry is whether the statute or regulation has, in fact, substantially impaired a contractual relationship. Energy Reserves, 459 U.S. at 411; Allied Structural Steel, 438 U.S. at 244; West Indian Co. v. Government of the Virgin Islands, 844 F.2d 1007, 1021 (3d Cir. 1988). If the plaintiff cannot demonstrate an impairment, or if the impairment is minimal, the inquiry ends here. Allied Structural Steel, 438 U.S. at 245; Nieves v. Hess Oil V.I. Corp., 819 F.2d 1237, 1243 (3d Cir. 1987).

▉ If the challenger can establish that its contracts are significantly impaired, then the government must be able to point to "a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." Energy Reserves, 459 U.S. at 411–12 (citation omitted); see also United States Trust Co. v. New Jersey, 431 U.S. 1, 22 (1977); Troy Ltd. v. Renna, 727 F.2d 287, 296–97 (3d Cir. 1984). If a legitimate public purpose exists, the legislation will be upheld if it is based "'upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" Energy Reserves, 459 U.S. at 412 (quoting United States Trust, 431 U.S. at 22); see also Keystone Bituminous Coal, 480 U.S. at 505; West Indian Co., 844 F.2d at 1022. In making this last determination, the courts use somewhat different standards, depending upon the type of contract at issue. If the contract is between private parties, then the courts generally defer to the legislative judgment as to the necessity and reasonableness of the statute. Keystone Bituminous Coal, 480 U.S. at 505; Energy Reserves, 459 U.S. at 412–13; Nieves, 819 F.2d at 1249. If, however, the state is a contracting party, then the legislative motives are more readily put into question; though the considered views of the legislature are still not without significance, the courts may scrutinize legislative intent more probingly. United States Trust, 431 U.S. at 22–23; West Indian Co., 844 F.2d at 1022.

▉ This court thus begins by considering whether the plaintiff has established that its contracts are significantly impaired. It is

clear, as a first step, that they *have* been impaired; the statute definitely reduces an employer's ability to discharge an employee. Moreover, the statute, by its terms, covers both contracts made before its enactment and contracts made after. Whether the statute *significantly* impairs employment contracts is, of course, another matter. To determine this for a facial challenge, it is necessary to examine the legal background against which the VIWDA operates. To the extent that an area is already the subject of regulation, the likelihood that the courts will find that contracts in that area are impaired will decline. Energy Reserves, 459 U.S. at 411; Nieves, 819 F.2d at 1248; Troy Ltd., 727 F.2d at 297.

When the VIWDA was enacted, the at-will employment doctrine had already been abrogated by the Virgin Islands courts. Until relatively recently, to be sure, the Virgin Islands used the traditional rule, set forth in the Restatements, that employment contracts could be terminated at the will of the employer or employee. Restatement (Second) of Agency § 442 (1958); see also V.I. Code Ann. tit. 1, § 4 (1967) (Restatement rules provide rules of decision in Virgin Islands courts). However, in Robinson v. Hess Oil V.I. Corp., 19 V.I. 106 (D.V.I. 1982), this court, through Judge Christian, held that the plaintiff could bring a wrongful discharge action against the defendant for a discharge that violated public policy. This exception has been recognized in most states, and has been reasserted by this court. Moore v. A.H. Riise Gift Shops, 659 F. Supp. 1417, 1421–23 (D.V.I. 1987) (collecting cases).

This is important because the extent of the impairment must be measured against the legal conditions that prevailed just before the VIWDA was enacted. If, for example, the VIWDA merely codified prior judicial opinions, it could hardly be said that the statute by itself impaired any contract at all. Indeed, the defendants argue that the VIWDA does nothing more than define public policy, and thus that it could not fail this first prong of the Energy Reserves test. This argument is ingenious, but incorrect. If the VIWDA did nothing more than set forth a list of reasons for discharge that would offend public policy, particularly if those reasons were drawn from the decisions of those jurisdictions that have adopted the public policy exception to the at-will employment doctrine, then it could fairly be said that the legislature had done no more than codify the common law. The VIWDA goes beyond this. It inverts the system by creating a list of *acceptable* reasons for discharge, proscribing all others that

are not justifiable by business necessity or other, similar reasons. Insofar as it defines public policy at all, it does so only negatively. By extending the common-law rule, the legislature has opened its actions to charges of contractual impairment.

However, there is substantial doubt whether there has been substantial impairment. This court assumes that the primary value in an employment contract is, on one side, the value of the labor, and, on the other, the wages extracted from the employer. Although the parties did not introduce evidence on this point, it is safe to assume that all hiring that is not explicitly temporary is undertaken with an expectation that the contractual relationship will continue. Given a work force that is basically stable, the right to fire an employee at will has relatively little value against the value of the employment contract as a whole.

This is not to say that an *absolute* ban on discharge would not work a substantial impairment of contract; if employees knew that they could not be discharged, it would be difficult for employers to maintain an efficient work force. The VIWDA, however, scarcely goes this far. Among the reasons that the statute approves are business competition, rudeness to customers, use of controlled substances or intoxicants, disobedience, negligence, absence, incompetence, inefficiency, dishonesty, and inability to work with others. V.I. Code Ann. tit. 24, § 76(a) (Supp. 1989). Furthermore, an employer may fire an employee because of economic hardship, cessation of business operations, or participation in unprotected concerted activity. V.I. Code tit. 24, § 76(c) (Supp. 1989). This covers almost every conceivable reason for which an employer might reasonably wish to discharge an employee. Most of what remains would strike against public policy, more traditionally defined (for example, discharge because of jury duty or racial animus).

The posture of this case makes this first analysis difficult. Contracts Clause cases rest significantly upon the interpretation of the contracts alleged to be impaired. However, this court cannot say that the complained-of impairment of contract reaches constitutional levels. Employee discharge, though not hitherto the subject of legislation, had been the subject of judicial action well before the VIWDA was enacted. Even before the VIWDA took effect, then, Virgin Islands employers hired their workers with the knowledge that their workers could not necessarily be discharged at will. Moreover, it can hardly be argued that the basic employer-employee relationship has

not been regulated, and regulated heavily, by the federal and territorial governments. Occupational safety, collective bargaining, minimum wages, workers' compensation, and other areas of legislation have left few aspects of the workplace unregulated. This case is thus analogous to Energy Reserves, Exxon, Keystone Bituminous Coal, and other such cases, in that the subject of regulation in the challenged statute is itself highly regulated.[16]

Moreover, an employer's ability to discharge an employee is not severely limited by the statute. As laid out above, the VIWDA grants employers great scope in managing their employees. The plaintiff has not given a single legitimate reason for which an employer might wish to fire an employee that is not covered by the statute, and this court can think of no significant ones.[17] When these factors are combined, this court must conclude that this statute, on its face, does not significantly impair employment contracts.

In this the VIWDA is distinguishable from statutes that have been held to impair contracts significantly. In Nieves, for example, the challenged statute completely abrogated the borrowed employee doctrine, thus significantly adding to the tort liability of employers. Similarly, in Allied Structural Steel, the statute radically altered the vesting rules of pension funds, creating large, immediate, and unanticipated liabilities for employers. The VIWDA does not act against existing contracts to this degree. This court therefore holds that the first prong of the Energy Reserves test is not passed by this facial challenge.

Even if it were, the statute would not be infirm, because it survives the other two prongs of the Energy Reserves test. The second, as laid out earlier, requires that there be a significant and legitimate public purpose behind the legislation. This is easily met here. The legislative history, summarized above, shows that the enactors were concerned about unfair work rules and arbitrary firing, particularly where bias against native Virgin Islanders was evident. See supra

---

[16] Admittedly, in those cases the industry itself was the subject of heavy regulation, rather than any particular aspect of it. However, this difference, if anything, supports this court's holding. Though a firm in a regulated industry may not expect further regulation in a thus-far unregulated aspect of its business, a firm already subject to substantial regulation in a particular area has little right to expect no further regulation.

[17] In any event, an employer and an employee are free to contract around the statute by creating additional reasons for discharge. V.I. Code Ann. tit. 24, § 76(a) (Supp. 1989).

section III.A. These are precisely the "broad and general social or economic problem[s]" that the Court has found legitimate. Energy Reserves, 459 U.S. at 411–12. They are the same types of concerns that have given rise to federal legislation barring discriminatory discharge, as well as, for example, legislation found in other areas that bars employers from discharging employees because they took advantage of workers' compensation statutes.

These reasons distinguish this case from others in which the legislative purpose was found infirm. The Court in Allied Structural Steel, for example, found the pension statute before it unconstitutional in part because it affected a very limited number of employers, and thus could not have a broad societal interest. 438 U.S. at 249. Likewise, in Nieves our Court of Appeals held a statute infirm because, as shown by the legislative history, the retroactive application of the statute affected a very few tort cases brought primarily against one employer, mentioned repeatedly in the proceedings. Nieves, 819 F.2d at 1250; see also, e.g., West Indian Co., 844 F.2d at 1022 (statute directed at single firm). Here, in contrast, the VIWDA applies to *all* employees and *all* employers. No particular employers were mentioned in the legislative history. In this sense, the VIWDA resembles far more strongly the mine subsidence statute in Keystone Bituminous Coal, the natural gas pricing statute in Energy Reserves and the landlord-tenant statute in Troy Ltd., all of which were generally applicable and addressed large questions of public concern. Keystone Bituminous Coal, 480 U.S. at 505; Energy Reserves, 459 U.S. at 412; Troy Ltd., 727 F.2d at 298. The challenge thus fails here as well.[18]

 Finally, the third prong—whether the effects upon contracts are appropriate, given the public concerns expressed—comes out for the defendants. In making this determination, this court must give substantial deference to the legislative will, because the territory is

---

[18] The plaintiff's argument that the VIWDA is in truth very narrowly based because it applies only retrospectively—that is, to contracts entered into before its enactment—is unfounded. It affects *all* employment relationships, whether made before or after its enactment. The plaintiff's argument must be, then, that all contracts made after the VIWDA's enactment would be made with it in mind, so it can change only those contracts made before it was enacted. This is, by definition, true, but it is also irrelevant. For the VIWDA to be addressed, as was the Nieves statute, only retrospectively, it would have to apply *only* to contracts made before its enactment. That is not the case here. In any event, the Nieves statute affected only a few pending cases, while the VIWDA affects a great many employment contracts.

not a party to the contracts affected. Energy Reserves, 459 U.S. at 412–13; Nieves, 819 F.2d at 1249. Given this deference, this court cannot conclude that the VIWDA is an unreasonable response to the legislature's concerns. The concerns expressed are clearly remedied by the statute. Though the structure of the statute is perhaps curious, in that it states acceptable reasons for discharge rather than unacceptable, the exceptions allowed are very large, including almost all motives for discharge that would not either already have violated public policy or run contrary to the intent of the legislature. It cannot be said as a matter of law that the statute as a whole, including these broad exceptions, is so unreasonable that it facially violates the Contracts Clause. Thus, on all three prongs of the Energy Reserves test, the VIWDA is facially valid. Judgment must thus be granted to the defendants on the facial claim.[19]

## D. *Takings Clause*

Finally, General Offshore argues that the enactment of the VIWDA amounts to a taking under the Fifth Amendment of the Constitution, as applied to the Virgin Islands by the Revised Organic Act.[20] It asserts that the right to terminate an employment contract without cause is a form of property and contends that the statute unlawfully transfers this contractual right to the public by creating a new interest in continuous employment which it then assigns to employees. Once again, the plaintiff fails to make out a successful facial challenge.

The Takings Clause, though, like the Contracts Clause, framed uncompromisingly, has of necessity been softened by judicial interpretation. As the Court recently pointed out, "[u]nder our system of

---

[19] The defendants ask that this court grant summary judgment in their favor on the as-applied challenges on substantive due process, equal protection, and Contracts Clause grounds, because the legal standards for a facial challenge are the same as those for an as-applied challenge. This court cannot grant this request. Even if the defendants are correct, this court, by holding that the as-applied challenges are not properly before this court, divested itself of jurisdiction to resolve the as-applied challenges. Naturally, the defendants will be able to invoke the law of the case doctrine, should this matter return to this court on a writ of review. See, e.g., Arizona v. California, 460 U.S. 605, 618–19 & n.8 (1983); Schultz v. Onan Corp., 737 F.2d 339, 345 (3d Cir. 1984). However, any attempt to resolve the as-applied challenges now is untimely and must be denied.

[20] The relevant clause of the Revised Organic Act states that "[p]rivate property shall not be taken for public use except upon payment of just compensation . . ." 48 U.S.C.§ 1561.

government, one of the primary ways of preserving the public weal is restricting the uses individuals can make of their property." Keystone Bituminous Coal, 430 U.S. at 491. For the state to function, then, it is necessary that, at times, the government must deprive owners of some of the value of their property. Of course, the Takings Clause does not prohibit this, as long as the owner is compensated. However, "[l]ong ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,' and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its right to enforce it." Keystone Bituminous Coal, 480 U.S. at 491–92 (quoting Mugler v. Kansas, 123 U.S. 623, 665 (1887)); see also Andrus v. Allard, 444 U.S. 51, 65 (1979). A takings determination must thus balance the nature and extent of the taking against the public benefit to be derived.

██ Accordingly, in Agins v. Tiburon the Court held that a statute or regulation constitutes a taking (1) if it does not substantially advance a legitimate state interest or (2) if it denies the owner the economically viable use of his property. Agins v. Tiburon, 447 U.S. 255, 260 (1980); see also Nollan v. California Coastal Comm'n, 483 U.S. 825, 834 (1987); Pace Resources, Inc. v. Shrewsbury Township, 808 F.2d 1023, 1030 (3d Cir. 1987). The first requirement, though it resembles in form the inquiries made for substantive due process and equal protection analysis, is in fact more stringent. Nollan, 483 U.S. at 834 n.3; Keystone Bituminous Coal, 480 U.S. at 491 n.20. However, the legislature is still entitled to some deference in its findings that the public interest would be advanced by a piece of legislation. Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978); Pace Resources, 808 F.2d at 1030.

██ ██ The second requirement is difficult to establish. In Penn Central, the Court laid out three factors that are relevant to any determination. First, a court must consider the economic impact upon the claimant. Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 191 (1985); Penn Cent. Transp. Co., 430 U.S. at 124. Even a substantial diminution in value may not constitute a taking, if the impact is ultimately unimportant. Allard, 444 U.S. at 66; Pace Resources, Inc., 808 F.2d at 1031. Second, "the extent to which the regulation has interfered with reasonable investment-backed expectations" will suggest whether a taking may have occurred. Penn Cent. Transp. Co., 438 U.S. at 124; see also William-

son County Regional Planning Comm'n, 473 U.S. at 191; Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984). This is not to say that a great impact upon contractual rights necessarily results in a taking. If a regulation deprives an owner of the best use of his property, but not the *sole* economically viable use, the courts are very unlikely to find a taking. Keystone Bituminous Coal, 480 U.S. at 495–96; Agins, 447 U.S. at 262; Pace Resources, Inc., 808 F.2d at 1031. Third, the courts are to consider the nature of the alleged deprivation of property. Penn Cent. Transp. Co., 438 U.S. at 124; Pace Resources, Inc., 808 F.2d at 1030. A permanent physical occupation, even of only a small portion of one's real property, will always be deemed a taking. See, e.g., First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 318 (1987); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434–35 (1982); Pinewood Estates v. Barnegat Township Leveling Bd., 898 F.2d 347, 351 (3d Cir. 1990). However, a regulation that merely deprives the owner of some of the value of the property is far less likely to be held constitutionally improper. Keystone Bituminous Coal, 480 U.S. at 488 n.18; Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 163 (1980); Penn Cent. Transp. Co., 438 U.S. at 124; Pinewood Estates, 898 F.2d at 350.

 These factors are very fact-dependent, which makes them difficult to weigh where, as here, the regulation is challenged facially. The Court has thus imposed a stringent requirement for facial takings cases. For a facial challenge to a statute to succeed, its "mere enactment" must constitute a taking. Agins, 447 U.S. at 260; see also, e.g., Keystone Bituminous Coal, 480 U.S. at 494–95; Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 295 (1981); Georgia Outdoor Advertising, Inc. v. City of Waynesville, 900 F.2d 783, 785 (4th Cir. 1990). It is unsurprising that the Court has characterized those who essay this sort of attack as "fac[ing] an uphill battle." Keystone Bituminous Coal, 480 U.S. at 495.

The defendants raise an interesting threshold argument. They maintain that the contractual rights of which the plaintiff claims deprivation are not property, as recognized by the Takings Clause, and hence cannot be taken. Whether intangible property rights deserve the protection of the Takings Clause was addressed by the Court in Monsanto. The Monsanto Court, referring to Board of Regents v. Roth, 408 U.S. 564 (1972), stated that the existence of a property right is determined with reference to state law. "Property

263

interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independant source such as state law." Roth, 408 U.S. at 577. Thus, in Monsanto, the Court, after determining that Missouri law created a property interest in trade secrets, held that such secrets constituted property within the meaning of the Takings Clause. Monsanto, 467 U.S. at 1003.

 The interest claimed here arises from contracts, which would appear to be neither more nor less tangible sources of rights than would be trade secrets. Indeed, the Court long ago held that valid contracts are property for the purposes of the Takings Clause. Lynch v. United States, 292 U.S. 571, 579 (1934) (Brandeis, J.); see also United States Trust Co. v. New Jersey, 431 U.S. 1, 19 n.16 (1977). It seems evident that the right to fire an employee has value to an employer, so, if the contract is a source of a property interest, then the partial deprivation of the right to fire an employee diminishes the value of the contract. The threshold issue must thus be resolved in favor of the plaintiff.

However, "the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into a taking." Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224 (1986). Applying the criteria laid out above makes it clear that the VIWDA exacts no taking. First, the statute meets the public purpose requirement. The legitimacy of the public purpose has been discussed above, and need not be repeated here. As this court has observed, there is a great "'need to protect employees who are not parties to a collective bargaining agreement or other contract from abusive practices by the employer.'" Moore v. A.H. Riise Gift Shops, 659 F. Supp. 1417, 1423 (D.V.I. 1987) (quoting Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 67, 417 A.2d 505, 509 (1980)). Furthermore, the VIWDA substantially advances this legitimate interest. The protection afforded by the statute is significant, as the earlier recital of its provisions shows. It effectively proscribes completely arbitrary discharges, as well as discharges based on animus against native Virgin Islanders and against employees who patronize the business after working hours (all issues of specific legislative concern, as shown by the legislative history). As a result, the first of the requirements has been met.

The second, as modified for a facial taking, is whether the mere enactment of the statute denies the property-owner the economically

viable use of his property. The plaintiffs fail here as well. General Offshore makes no claim that because of the VIWDA restrictions, it can no longer operate a profitable business. As Keystone Bituminous Coal made clear, this lack of proof makes the plaintiff's argument especially difficult. 480 U.S. at 495–96. The statutory restrictions are limited and leave the plaintiff with many reasons for which it may continue to terminate its employees. By no means has the right to discharge employees been totally destroyed; it has merely been altered somewhat. This falls far short of the massive deprivation that has generally been required for the courts to find a taking in a governmental action short of the physical occupation of real property. See, e.g., Connolly, 475 U.S. at 225–26; Agins, 447 U.S. at 262; Allard, 444 U.S. at 66; Empire Kosher Poultry, Inc. v. Hallowell, 816 F.2d 907, 915–16 (3d Cir. 1987).

More specifically, all three factors of the Penn Central test come out against General Offshore. The first, the economic impact upon the claimant, has already been discussed. There are no allegations that General Offshore teeters on the edge of insolvency because of its diminished right to fire employees arbitrarily. Even if we assume that there may be some financial loss, the present posture of the case does not allow this court to conclude that the loss derived from the enactment of the VIWDA reaches constitutionally offensive levels. The plaintiff seeks to avoid this difficulty by asserting that the sole right in question here is the right to discharge workers at will, which, it argues, has been interfered with greatly. Even if this were true, which this court does not accept, it is at best marginally relevant. The primary expectation of a labor contract is the exchange of work for wages. This is wholly unimpaired by the VIWDA, which by definition deals only with the lesser value of a labor contract—the right to discharge. Even if the right to discharge were significantly impaired, it is but one of an inseparable group of rights held by the employer. Property rights cannot be dissected out at the claimant's convenience; they must be looked at as a bundle. Keystone Bituminous Coal, 480 U.S. at 497; Ruckelshaus, 467 U.S. at 1003; Penn Cent. Transp. Co., 438 U.S. at 136–37. Hence, "where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." Allard, 444 U.S. at 65–66. So viewed, the VIWDA withstands challenge.

The second factor, whether the VIWDA interfered with reasonable investment-backed expectations, comes out similarly. The loss here

would of necessity be a loss of future profits, and, as the Court has stated, "a loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim." Allard, 444 U.S. at 66. It may also be doubted whether General Offshore would be entitled to expect that its rights to fire employees would be sacrosanct. The Robinson and Moore opinions of this court, referred to earlier, already abridged the at-will employment doctrine. This might well be enough to place General Offshore on notice that its ability to discharge employees might be reduced further, whether by court or legislature. Finally, the extent of the deprivation, though not precisely determinable in this posture, cannot be immense, as it is not directed toward the primary worth of the labor contract. It thus is not up to the very substantial levels required where the taking is merely regulatory. Penn Cent. Transp. Co., 438 U.S. at 136–37; Empire Kosher Poultry, Inc., 816 F.2d at 915–16; Pace Resources, Inc., 808 F.2d at 1031, 1033.

Third, the nature of the taking militates against General Offshore. The VIWDA does not effect a permanent physical taking of real property; rather, it is a public program intended to further the common good. The plaintiff suggests that the employee would, under this statute, have the status of a tenant who cannot be evicted, and thus by analogy argues that this statute is in essence a physical taking. General Offshore is correct insofar as it argues that a regulation may amount to a physical taking. For example, a statute that removes a landlord's ability to evict a tenant after a lease expires, instead granting the power of choice to the tenant, may be a physical taking. Pinewood Estates, 898 F.2d at 353. However, there the regulation resulted in actual physical occupation of a piece of real property. Here, in contrast, the employer would at most have to retain an employee who, by definition, is economically productive (or he could be fired). It is difficult to see how this is less of a regulation than, say, a statute that bars the sale of relics containing parts of protected birds (Allard) or a statute that prevents a mine owner from removing part of the coal to which he has rights (Keystone Bituminous Coal). Thus, the VIWDA falls under the less-closely scrutinized heading.

■ In sum, the three factors of the Penn Central test come out against General Offshore, thus supporting this court's conclusion that the second requirement of Agins, like the first, sustains the statute. Consequently, the enactment of the VIWDA does not amount to a taking of private property without just compensation. This court

266

shall thus grant summary judgment on the facial takings claim to the defendants.

## IV. CONCLUSION

 In sum, then, this court holds that General Offshore's challenge to the VIWDA is only properly before this court insofar as it represents a facial attack on the statute. Any as-applied attack must await resolution of the Martin complaint before the Commissioner. None of the facial challenges raised in the motions before this court, whether based on substantive due process, the Equal Protection Clause, the Contracts Clause, or the Takings Clause, passes muster. Consequently, this court shall grant summary judgment for the defendants on these facial attacks on the VIWDA, and dismiss the corresponding as-applied attacks without prejudice for want of jurisdiction.[21]

An order follows.

## ORDER

AND NOW, this 6th day of August, 1990, upon consideration of the plaintiff's Motion for a Preliminary Injunction and Motion for Summary Judgment, the Defendants' Motion for Summary Judgment, and the responses thereto, IT IS ORDERED that:

1. The Motion for a Preliminary Injunction is DENIED;

2. The plaintiff's Motion for Summary Judgment is DENIED;

3. The defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Judgment is granted for the defendants and against the plaintiff on the facial challenges based on violations of substantive due process, the Equal Protection Clause, the Contracts Clause, and the Takings Clause; and

4. The complaint is DISMISSED WITHOUT PREJUDICE for want of jurisdiction as to the as-applied challenges based on violations of substantive due process, the Equal Protection Clause, the Contracts Clause, and the Takings Clause.

---

[21] It must be noted that the labor preemption argument raised in the complaint was not addressed in either motion for summary judgment. Therefore, this issue remains unresolved, and so only partial summary judgment can be granted here. Until this issue is addressed, this action remains open.